John PATTERSON, Marion Moshoe, Edmund Page, James Randolph and Percy Taylor, each individually and on behalf of all other persons similarly situated, and Equal Employment Opportunity Commission, Appellees,

v.

The AMERICAN TOBACCO COMPANY, a Division of American Brands, Inc., Appellant,

and

Tobacco Workers' International Union, an unincorporated association, et al., Defendants.

John PATTERSON, Marion Moshoe, Edmund Page, James Randolph and Percy Taylor, each individually and on behalf of all other persons similarly situated, and Equal Employment Opportunity Commission, Appellees,

v.

TOBACCO WORKERS' INTERNATIONAL UNION, an unincorporated association, Local 182, Tobacco Workers' International Union, an unincorporated association, Appellant.

Nos. 78-1083, 78-1084.

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1978.

Decided Oct. 23, 1978.

Widener, Circuit Judge, concurred in part and dissented in part and filed opinion.

See also 4th Cir., 535 F.2d 257.

Henry T. Wickham, Richmond, Va. (John F. Kay, Jr., Stephen A. Northrup, Mays, Valentine, Davenport & Moore, Richmond, Va., on brief); Jay J. Levit, Richmond, Va. (Paul G. Pennoyer, Jr., Arnold Henson, Bernard W. McCarthy, Chadbourne, Parke, Whiteside & Wolff, New York City, on brief), (James F. Carroll, New York City, on brief), for appellants.

Henry L. Marsh, III, Richmond, Va. (S. W. Tucker, Randall G. Johnson, Richmond, Va., John W. Scott, Jr., Chapel Hill, N. C., Hill, Tucker & Marsh, Richmond, Va., on brief); Ramon V. Gomez, Atty., E. E. O. C., Washington, D. C. (Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, E. E. O. C., Washington, D. C., on brief), (Jack Greenberg, Barry L. Goldstein and O. Peter Sherwood, New York City, on brief), for appellees.

Before WINTER, BUTZNER and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

These appeals by American Tobacco Company (American) and Tobacco Workers' International Union (Union) from the district court's denial on the merits of their motion under F.R.Civ.P. 60(b) require us to decide whether our decision in *Patterson v. American Tobacco Co.,* 535 F.2d 257 (4 Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976), and the order of the district court implementing our views, must be modified to conform to the later decisions of the Supreme Court in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396

(1977); *United Airlines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); and *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The district court thought not, but we think that *Teamsters* requires further proceedings. We therefore affirm in part and vacate and remand in part.

### I.

Briefly stated, the instant case is a consolidation of an action by EEOC and a class action by black employees to redress race and sex discrimination in working conditions at three facilities operated by American in Richmond, Virginia. The district court found that, before 1963, racial discrimination in hiring, promotion and working conditions was overt. The district court found no discrimination in American's hiring practices after 1965, but it did find that, while promotional policies after 1968 were "facially fair and neutral," they were discriminatory in operation because they served to perpetuate the effects of past discrimination. The district court granted sweeping relief; but, as modified by us, the relief granted was limited to (1) requiring American to post more definite written job descriptions when vacancies occurred; (2) requiring American to eliminate lines of progression in six of nine job groups; (3) requiring American to permit blacks in the prefabrication department in one branch to transfer to a job in the fabrication department at another branch without losing company seniority despite American's long-standing policy disallowing interbranch transfers with retention of company seniority; (4) granting back pay to employees unlawfully denied promotion; and (5) requiring American to develop and apply objective criteria for appointing supervisory personnel. A fuller description of the facts, the district court's decision and our views appears from our opinion in *Patterson v.*

*American Tobacco Co., supra.* As needed, we will amplify our description of them elsewhere in this opinion.

We turn to a consideration of the effect of each of the subsequently decided Supreme Court cases.

### II.

So far as pertinent here, *Teamsters* concerned an employer who was a common carrier of motor freight with nationwide operations. The employer had been found to have engaged in a pattern and practice of employment discrimination against Negroes and Spanish-surnamed Americans in hiring line drivers. The members of these minority groups had been hired only in lower paying, less desirable jobs as servicemen or local city drivers. Thereafter they were discriminated against with respect to promotions and transfers because of the seniority system established by the collective bargaining agreements between the employer and the union. That system provided that a line driver's seniority for competitive purposes, such as the order in which he may bid for particular jobs, is laid off or is recalled from layoff, dated from the date he became a line driver and not the date that he was initially employed if he had been employed originally as a city driver or serviceman.

The Court had no difficulty in concluding that the vice of this seniority arrangement was that it "locked" minority workers into inferior jobs and perpetuated prior discrimination by discouraging transfers to jobs as line drivers, and the Court concluded that under *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the seniority system would be invalid, unless § 703(h) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h) required a different conclusion.[1] From its review of the language of § 703(h) and its legislative history, the Court said that with respect to pre-Act discrimination "the unmistakable

---

1. In pertinent part, § 703(h) provides that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . , provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin."

purpose of § 703(h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII." 431 U.S. at 352, 97 S.Ct. at 1863. Stressing the language of § 703(h), however, the Court also held that the statute "does not immunize *all* seniority systems. It refers only to 'bona fide' systems, and a proviso requires that any differences in treatment not be 'the result of an intention to discriminate because of race . . or national origin. . . .'" (Emphasis added.) 431 U.S. at 353, 97 S.Ct. at 1863. The overall holding of the Court was that "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." 431 U.S. at 353–54, 97 S.Ct. at 1864.

■ As construed by the Court in *Teamsters*, § 703(h) carves out an exception to the holding of *Griggs* that an otherwise neutral practice which perpetuates the effects of past employment discrimination is violative of Title VII. As we read *Teamsters*, this is a narrow exception, concerning only practices directly linked to "a bona fide seniority system." Section 703(h) does not insulate an entire promotional system even if such system is facially neutral. At most, it insulates only the seniority aspects of the promotional system. Consequently, *Teamsters* requires no modification of the relief we approved with regard to job descriptions, lines of progression, back pay (except such awards as may have been founded upon American's seniority system) or supervisory appointments. Only our decision to allow black employees to make interbranch transfers with the retention of company seniority impinges upon American's *seniority* system. It is, therefore, only this aspect of the relief granted in *Patter-*

son that is called into question by *Teamsters*.

In conforming our decision to *Teamsters*, we recognize the limitation of its holding that under § 703(h) only "bona fide" seniority systems insulate the present effects of pre-Act discrimination.[2] In the instant case, the district court was equally aware of this limitation. It concluded, however, that American's seniority system was not bona fide (1) "because this system operated right up to the day of trial in a discriminatory manner," and (2) because "[t]his seniority system had a discriminatory genesis . . [t]he background of labor relations of [American] and the seniority system clearly shows this to be true . . . [t]he record in this case clearly supports this finding."

While we agree with the district court that American's seniority system would not be bona fide if it either currently served a racially discriminatory purpose or was originally instituted to serve a racially discriminatory purpose, we cannot sustain the district court's ultimate findings in this regard. The district court made no subsidiary findings, either in its initial decision or in its ruling on the Rule 60(b) motions, to support its ultimate conclusions. It is thus impossible for us to tell upon what underlying facts the district court relied and whether proper statutory standards were observed. *See Kelley v. Everglades Drainage District*, 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943); *Schneiderman v. United States*, 320 U.S. 118, 130, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943); *O'Neill v. United States*, 411 F.2d 139, 145–46 (3 Cir. 1969); *Woods Construction Co. v. Pool Construction Co.*, 314 F.2d 405, 406–07 (10 Cir. 1963); *Knapp v. Imperial Oil & Gas Products Co.*, 130 F.2d 1, 3–4 (4 Cir. 1942).

**2.** Because in *Teamsters* it was conceded that the seniority system "did not have its genesis in racial discrimination, and . . . was negotiated and has been maintained free from any illegal purpose," 431 U.S. at 356, 97 S.Ct. at 1865, the Court did not find it necessary to expound on the factors which make a seniority system "bona fide." In approving the concession, the Court did state that the system applied to all employees, regardless of race or

national origin, that all non-line drivers were locked into their positions, and that separate employment conditions for line drivers was "rational" under industry practice and precedents of the National Labor Relations Board. But it gave us and the other lower federal courts no additional guidance. We do not attempt an overall definition of "bona fide" at this stage of this case; we await the full development of the facts.

■ It is not surprising that the district court's findings in its original decision did not completely assay the field since *Teamsters* had not yet been decided. While ordinarily we would not think that F.R.Civ.P. 52 requires the same degree of specificity in findings of fact when a Rule 60(b) motion is denied on the merits as it requires in a non-jury trial, the fact is that in the instant case the decision in *Teamsters* intervened between the initial decision on the merits and the denial of the Rule 60(b) motions. Since the effect of *Teamsters* raised new and difficult issues, we think that we are justified in requiring full compliance with Rule 52. That compliance necessitates remanding the issue to the district court for further findings. On remand, the district court may reopen the record and receive additional proof with regard to the bona fides of American's seniority plan since that issue emerged after the original record was made.

### III.

■ We think that neither *United Air Lines, Inc. v. Evans, supra*, nor *Hazelwood School District v. United States, supra*, requires us to modify our original decision in the instant case.

*Evans* held that Title VII was not violated by an employer which, consistent with its bona fide seniority system, declined to grant retroactive seniority to an employee who was rehired after having been earlier discharged as a result of a discriminatory practice, when that employee at the time of her discharge had failed to file a timely charge with EEOC. American and the Union contend that *Evans* stands for the proposition that American's promotional system may not now be modified despite a finding of a *Griggs* violation, because plaintiffs failed to file a timely challenge to this system after its adoption in 1968. We do not read *Evans* so broadly. *Evans* dealt only with a one-time violation (a discriminatory discharge) which had a continuing effect only as the result of an otherwise neutral seniority system. It did not deal with a continuing violation such as a discriminato-

ry promotional system where the discrimination continues from day to day and a specific violation occurs whenever a promotion is made. *Evans* does not purport to limit the broad remedial powers of a federal court. But for § 703(h) and its validation of the present effects of a bona fide seniority system, a court, in a proper case like the instant one, may still redress the present effects of past discrimination by requiring the modification of present practices which repeat that discrimination.

*Hazelwood* was a case of racial discrimination in the employment of school teachers for public schools. So far as pertinent here, it held that (1) in determining from statistical proof whether a prima facie case of discrimination had been shown, the proper consideration was between the racial composition of the school district's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market, and (2) if that comparison showed sufficient substantial disparity to constitute a prima facie case, the employer must still be given the opportunity to show that the disparity resulted from pre-Act hiring rather than illegal post-Act discrimination. That is, *Hazelwood* admonishes courts in Title VII cases to give careful consideration to post-Act hiring data.

American and the Union contend that, when properly applied, *Hazelwood* requires the conclusion that the district court's determination that American had practiced racial and sexual discrimination in the employment of supervisory personnel cannot stand and that that finding and the relief flowing from the alleged violation must be set aside. Essentially, their argument is that liability was found solely on statistics showing the percentages of blacks and females in American's supervisory work force at various dates, but that there was no comparison with the relevant supervisory population nor were pre-Act supervisory appointments eliminated from the relevant statistics.

To these contentions, there are various answers. As the district court recognized in denying the Rule 60(b) motions, *Hazel-*

*wood* is in part a decision as to what constitutes a prima facie case. In the instant case, American and the Union were not held to have violated the Act on the theory that a prima facie case was proved against them. They were given full opportunity to rebut the statistical proof, and they availed themselves of it. The total proof, even under *Hazelwood*, showed violations.

In our earlier opinion, we disclosed our recognition of the total proof in discussing what relief would be appropriate. We stated our recognition that Title VII was not retroactive and that the racial and sexual percentages of appointments after Title VII became effective were the significant ones. 535 F.2d at 274. Nonetheless, we concluded that, notwithstanding that appointments since 1965 of qualified blacks and women exceeded the ratio of these groups in the workforce, American was not exonerated from a violation of Title VII because "[t]he tardy appointments of blacks and women to supervisory positions long after the passage of Title VII and the present lack of published job descriptions and objective selection procedures fully justify the injunctive relief the district court ordered." 535 F.2d at 275. *Hazelwood* clearly recognizes the sufficiency of such proof. 433 U.S. at 309–10 n.15, 97 S.Ct. 2736.

We therefore conclude that *Hazelwood* not only requires no modification of our prior holding with respect to supervisory personnel, but indeed reinforces our views.

For these reasons, the order of the district court denying the motions of American and the Union under F.R.Civ.P. 60(b) on their merits is affirmed in part and vacated and remanded in part for further proceedings consistent with this opinion.

*AFFIRMED IN PART; VACATED AND REMANDED IN PART.*

WIDENER, Circuit Judge, concurring and dissenting:

I agree that the case should be remanded for reconsideration in the light of *Teamsters*, although I do not agree with the narrow construction of *Teamsters* which the majority advocates.

I respectfully dissent from the refusal of the majority to remand the case for reconsideration in the light of *Hazelwood*, and also respectfully dissent from the refusal of the majority to require a reconsideration of the case on remand in the light of *Evans*.

I

The evidence in this case upon which the district court found liability was statistical. That court did not find "specific proof of overt or particular acts of discrimination." The whole case must be read with that background.

II

The facts in this case are found by the district court, and I accept them for the purpose of this dissent. My disagreement with the majority as it refuses to apply *Hazelwood* is not a factual dispute; rather, I dissent from its refusal to apply that case in a factual situation which demands its consideration.

III

*Teamsters*

While I have indicated that I concur in the remand for reconsideration in the light of *Teamsters*, I think the remand too narrow in at least one respect.

In our opinion, the bounds of our remand were based on the following statement:

"As construed by the Court in *Teamsters*, § 703(h) carves out an exception to the holding of *Griggs* that an otherwise neutral practice which perpetuates the effects of past employment discrimination is violative of Title VII. As we read *Teamsters*, this is a narrow exception, concerning only practices directly limited to 'a bona fide seniority system'. Section 703(h) does not insulate an entire promotional system even if such system is facially neutral. At most, it insulates only the seniority aspects of the promotional system." P. 303.

We then continue, "Consequently, *Teamsters* requires no modification of the relief we approved with regard to job descriptions, *lines of progression,* back pay (except such awards as may have been founded upon American's seniority system) or supervisory appointments." (Italics added).

It is to the part of our opinion respecting "lines of progression" that I here take exception as well as to the reasoning.

We decline to require the district court to reconsider that matter because *Teamsters* insulated only "seniority aspects" of the system, our construction of § 703(h) being a "narrow exception" to the holding of *Griggs.*

I doubt that we should say a statute enacted by Congress which has just received a literal construction by the Supreme Court in *Teamsters* can be said to be a "narrow exception." By the same token, I doubt that *Teamsters* can be said a "narrow exception" to *Griggs,* or that both *Teamsters* and § 703(h), read together, make up a "narrow exception."

It is entirely in line with our limiting of *Teamsters* and § 703(h) that we disregard footnote 41 at p. 355, 97 S.Ct. at p. 1864 of *Teamsters.* That note provides in pertinent part:

"Then as now, seniority was measured in a number of ways, including length of time with the employer, in a particular plant, in a department, in a job, or in a *line of progression.* . . . (citations omitted). The legislative history contains no suggestion that any one system was preferred."

The opinion of the district court does not discuss in any detail the origin of the lines of progression referred to in paras. 38–47 of the stipulation of the parties. Neither does Finding 38 of the district court, which, with three exceptions, finds them not justified by business necessity. How or if lines of progression are tied to a seniority system, especially to a collective bargaining agreement, whether bona fide or not, was simply not contemplated by the parties, by the district court, or by us in our previous opinion. Neither are any details of their operation shown. This is shown not only by the opinion and findings of the district court but by the references in our previous opinion to the lines of progression summarized accurately by this quotation: "In this respect, the lines of progression perpetuated the effects of past discrimination in a manner similar to the formerly segregated departmental seniority rosters." p. 264. It is at once apparent that the situation just described from our opinion in this case is very similar to the situation which faced the Court in *Teamsters,* as described by the Court at p. 350, 97 S.Ct. at p. 1862: "This disproportionate distribution of advantages does in a very real sense 'operate to "freeze" the status quo of prior discriminatory employment practices.'" This point should be of especial interest to the union defendants, for while we recited, at p. 270, that the "local acquiesced without protest in the lines of progression," it might be of significant difference if the lines of progression were part of a bona fide seniority system. And from all of the defendants' standpoints, it undoubtedly makes a difference as to whether there is one defense to assert, business necessity, or two, business necessity and § 703(h).

Nothing in the record shows that the lines of progression here are significantly different from those described in the Cooper and Sobol Article found in 82 Harvard L.Rev. 1598 which the Court referred to in note 41.

For these reasons, I think the question of whether the "lines of progression" are a part of a bona fide seniority system, all aspects of which we have dismissed in our opinion with little discussion, is worthy of further examination in the light of *Teamsters,* especially n. 41 thereof. I express no opinion on the merits of the question, but I insist it should be factually developed because the law has changed since our opinion, as everyone acknowledges.

## IV

### *Hazelwood*

A. The Richmond office, with only four or five vacancies involved, as distinguished

from the Richmond branch, is not a part of this appeal, and I do not consider it in this dissent.

B. I am in basic agreement with the statement in the proposed opinion, page 12, that "*Hazelwood* admonishes courts in Title VII cases to give careful consideration to post-Act hiring data," but I cannot agree with its application to affirm the district court's finding of liability as to the defendant's selection of supervisory personnel.

What the opinion overlooks is that *Hazelwood* establishes that a Title VII employer which from the applicable date "made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes." 433 U.S. at 309, 97 S.Ct. at 2742. Reviewing the findings of the district court with regard to supervisory promotion and hiring, I do not find the evidence of post-Act discrimination compelling; indeed, if we must find one way or another, the opposite seems to be true. In considering the statistics set out below, I note that the defendants claim that in the Richmond SMSA, the relevant labor market under *Hazelwood*, black people constitute 12% of those eligible for the supervisory work force, and females 5%. Appellants' brief in Nos. 78–1083–84, at pages 9–10 and 37. These figures are the same as the defendant company's opening brief, page 14, in Nos. 75–1259 through 63. I have been unable to find in plaintiff's brief either on this or the previous appeal, or in the EEOC brief in Nos. 75–1262/1263, any dispute that 12% and 5% are the correct figures for the Richmond SMSA, so I consider them to be correct, for they favor the plaintiffs more than the SMSA figures we used in our previous opinion, p. 275, 6.8% black and 1.5% women. Employment of the percentages we used before would weight what I have to say far more toward the defendants.

At the Virginia branch, I note the district court found that since the effective date of Title VII "at least eighteen employees have been hired for or promoted to the position of assistant foreman. . . ." (Finding (F.16), App. at page 58). The court further found that in 1963 the first black supervisor was promoted from the ranks at the Virginia branch (F.47, App. 63); that as of May 16, 1969 three supervisors were black (F.48, App. 63); that as of April 16, 1973 five supervisors were black (F.49, App. 64); and that as of January 1, 1974 six supervisors were black (F.50, App. 64). The first female supervisor at the Virginia branch was selected in 1972 (F.100, App. 75–76); and as of June 1, 1973 there were three female supervisors (F.101, App. 76).

Applying the relevant percentages of the Richmond SMSA under the *Hazelwood* analysis, we would expect that if defendants had selected the eighteen post-Act supervisors in a non-discriminatory manner, 12% of them or 2.16 would be black, and 5% or .9 would be female. The district court's findings do not, unfortunately, indicate the date, race, and sex of each post-Act Virginia branch supervisor selection, and most importantly do not indicate the date of each vacancy, the person who filled it, and the applications for the position. But, it is almost certain that of the six black supervisors employed on January 1, 1974, five were appointed after July 1, 1965. See plaintiff's exhibit 35J. Ex.App. 127–131. If this is true, five of the eighteen supervisory post-Act selections were black, a percentage of 27.7%, more than twice the figure to be expected under *Hazelwood*. By May 16, 1969, only four months after the EEOC complaint had been filed and almost four years *before* either suit was filed, it again seems almost certain that of the three black supervisors then employed, two were hired post-Act. See plaintiff's exhibit 35J. Assuming that after that date only black people were selected as supervisors (the worst case for defendants playing catch-up), even as of May 1969, two of thirteen post-Act selections or 15.3% were black. Thus, by 1969 the defendants already had exceeded the percentage to be expected under *Hazelwood*.

Analyzing the finding of sex discrimination in the selection of Virginia branch supervisors leads to very much the same re-

sult. The first female supervisor was selected in 1972 (F.100, App. 75–76), and with that selection the company had exceeded the *Hazelwood* expected percentage, for if only one of eighteen post-Act supervisory appointments were female this would be 5.5%, exceeding the expected *Hazelwood* percentage of 5%. In fact, three of the eighteen post-Act supervisory appointments were female, a percentage of 16.67% or more than three times the *Hazelwood* expected figure.

At the Richmond branch similar results obtain as at the Virginia branch. There were nine post-Act supervisory selections at the Richmond branch (F.17, App. 59). The first black supervisor at the branch was selected from the ranks June 1, 1966 (F.51, App. 64). The second black supervisor was selected from the ranks February 1, 1971 (F.53, App. 64). As of June 1, 1973 there were three black supervisors (F.56, App. 64). Applying *Hazelwood,* we would expect to find 12% or 1.08 of the nine selectees were black. This figure was reached by the

1966 promotion (since I think we must disregard the .08 person), almost three years *before* the EEOC complaint was initiated and seven years *before* the filing of either case. In fact, from the district court's findings it appears that three of the nine post-Act selections went to black people; this 33% figure considerably exceeds the *Hazelwood* expected figure of 12%.

The first female supervisor at the Richmond branch was selected from the ranks in 1967 (F.102, App. 76). By June 1, 1973, there were two female supervisors (F.88, App. 70; F.103, App. 76). Under *Hazelwood* we would expect 5% or .45 of the nine supervisors to be female. The 1967 selection, two years *before* the EEOC proceedings, and years before suit was filed, more than doubled the expected percentage, and the additional post-Act selection of another woman by 1973 presents a figure of 22%, more than four times the expected figure of 5%.

To summarize the pertinent data:

| | | Hazelwood percentage | Actual percentage | Date of meeting Hazelwood expectancy |
|---|---|---|---|---|
| Virginia Branch: | black | 12% | 27.7% | May 16, 1969 |
| | female | 5% | 16.67% | 1972 |
| Richmond Branch: | black | 12% | 33% | June 1, 1966 |
| | female | 5% | 22% | 1967 |

Defendants have made similar points in their brief, see opening brief in Nos. 78–1083/84 at 9–10, 37–38, but we did not consider them in our opinion.

These post-Act data indicate that in every circumstance at the Richmond and Virginia branches the actual selection of supervisors surpassed the numbers we might expect when applying, as we must, the methodology of *Hazelwood.* We may not, I think, on these data, consistent with *Hazelwood,* affirm the district court's finding of discrimination in supervisory selections. If the selection of supervisory personnel outlined above does not statistically satisfy the Supreme Court's requirement that post-Act employment decisions be made on a nondis-

criminatory basis, the company and union justifiably may ask what post-Act actions could have statistically complied with our interpretation of Title VII.

As the data disclose, post-Act supervisory selections have favored, rather than burdened, women and black people. Accordingly, on this record we should vacate the injunction ordering the company to develop objective criteria for the selection of supervisors. The statistics verify that no adverse impact has been visited upon the plaintiff classes as a result of the subjective criteria, and thus there is no need for equitable relief. If we affirm the injunction, we will be ruling in effect that subjective selection criteria are a *per se* violation of Title VII,

that is, a violation regardless of whether the practice has adversely affected a protected class. That the practice has not been proved to have affected any individual must be conceded absent further factual development. In fact, on the record as it now stands, not only is injunctive relief uncalled for, but in the absence of any evidence except the statistics and evidence now before us, I think we should properly direct the entry of judgment for the defendants on the entire issue of supervisory selection at the Richmond and Virginia branches. When I say absence of other evidence except statistics and that presently in the record, I keep in mind the absence of objective criteria and tardy appointments. I think I have demonstrated above that so far as this record shows the appointments were not tardy at the Richmond and Virginia branches unless pre-Act appointments are included which *Hazelwood* forbids. The plaintiffs, having not proved by post-Act statistics any adverse effect on the plaintiff classes, and the appointments not being tardy, the mere fact that there is no objective criteria for promotions in this case is irrelevant. I grant that in a proper case it may be relevant, and having objective criteria might seem to be prudent to avoid suspicion, but I doubt that our authority extends so far when no post-Act violation has been shown. Indeed, we have recently been reminded of that fact in *Furnco Construction Corp. v. Waters*, —— U.S. ——, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), when the Court said: "Courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it." P. ——, 98 S.Ct. p. 2950.

My construction of *Hazelwood* is fortified by the following quotation from *Teamsters*, p. 350, 97 S.Ct. p. 1862, upon which the Court depended and which comes from the Congressional Record:

" 'Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, *if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a non-discriminatory basis. He would not be obliged—or indeed, permitted—to fire whites in order to hire Negroes or to prefer Negroes for future vacancies, or, once Negroes are hired to give them special seniority rights at the expense of the white workers hired earlier.*' 110 Cong.Rec. 7213 (1964) (emphasis added)." (Italics are the Supreme Court's.)

In view of the facts found by the district court I have recited, I think it it apparent that we did not apply the principles of *Hazelwood*. Our opinion, I think, misconceives its holding. That case requires, at the very least, in a matter such as we have before us, which depends on statistical evidence for a finding of liability, an analysis of the employer's and the unions' actions since the enactment of Title VII. A reading of the findings and opinion of the district court discloses that it did not make such an analysis, and a reading of our opinion discloses that we did not. While we did indicate, at p. 264 of our earlier opinion, that "after the effective date of Title VII" the company and union discriminated, a review of our analysis of the supervisory appointments which is part III of that opinion, beginning at p. 277, at once should show us our error. There, we considered the dates of some, but not all, post-Act appointments and found them "tardy" notwithstanding that they exceeded statistical sufficiency when measured as a group. *What we did not consider, as did not the district court, were the dates of each of the appointments as well as the dates of each of the various vacancies which brought about the appointments.* That is what *Hazelwood* commands, and that is where, lacking *Hazelwood's* guidance, we erred. Our error is pointed up in *Furnco*, —— U.S. at p. ——, 98 S.Ct. at p. 2951, where the Court states: "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately

represented in the work force." (Italics are the Court's). Neither we nor the district court considered *each* vacancy, the date thereof, and how it was filled, as the beginning point of a statistical analysis. Absent such, any conclusion based on statistical inferences may not stand in the light of *Hazelwood*.

The statistical facts I have used are undisputed and found by the district court. Yet there are certain omissions in them because a *Hazelwood* analysis was not engaged in. I am also aware that an employer cannot, by playing catch up, "erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it." *Teamsters* p. 342, 97 S.Ct. p. 1857. Yet those affected must be "victims of the earlier post-Act discrimination." *Teamsters* p. 342, 97 S.Ct. p. 1857. For these reasons, in order to be entirely fair, I would not enter judgment for the defendants, but would remand the case to have the district court inquire into each promotion to supervisory status made since the enactment of the statute, as well as far enough prior to its enactment to insure continuity. There have been so few post-Act appointments, less than 30, that such an inquiry is a small task. Only by a post-Act analysis of the employer's and unions' employment decisions may *Hazelwood* be complied with. I think this analysis has not yet been made either by us or by the district court and I would require it now.

## V

### Evans

If I agreed with the majority as to the construction the defendants wish us to place upon *Evans* and how they wish us to require the district court to apply that case on remand, I might concur in its opinion in that respect. However, I do not read the contentions of the defendants as does the majority, so I think its direction not to apply *Evans* is premature.

As I read the papers, the defendants seek to apply *Evans* to insulate themselves from liability premised on the pre-1968 practices of job experience seniority of "qualifications," and "canvassing." Opening brief at 19, reply brief at 6. They argue that, since no EEOC charge was filed within 90 days of the 1968 agreement, acts under it are now barred from suit because of § 706(d), 42 U.S.C. § 2000e–5(d) (since amended). In fact, they seem to argue that because of *Evans* these practices are not relevant to the determination of Title VII liability. See reply brief at 4.

The second point may be disposed of by reference to the paragraph in *Evans* quoted in the margin.[1] Although when the period has run the employer may not be held liable for the discriminatory act, that act still "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." 431 U.S. at 558, 97 S.Ct. at 1889. Thus, it appears the pre-1968 practices of "qualifications" and "canvassing" were admissible evidence, and should not be excluded merely because the limitations period has run.

The first argument of defendants, that they may not be held liable for the "qualifications" and "canvassing" procedures because more than 90 days had run between the cessation of those practices and the institution of the *Patterson* suit, I think, premature at this point. *Evans* applies a statute of limitations, and it is generally accepted that the period will not begin until a cause of action accrues. 54 C.J.S. *Limitations of Actions* § 108. Just because more than ninety days passed between the cessation of the illegal practices and the filing of the suit is not dispositive; it seems that the causes of action of individual class members affected by those practices will not necessarily have accrued by the time the practices stopped if they had suffered no dam-

---

1. "A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." 431 U.S. at 558, 97 S.Ct. at 1889.

age by that time. Accordingly, I think the applicability of *Evans* to the limitations period should be left to the district court on remand, for only then can it be known when the individual causes of action arose.

Deciding now that *Evans* has no application I think premature, just as would be deciding now it had across-the-board application.