634 F.2d 744
 24 Fair Empl.Prac.Cas. 531,
24 Empl. Prac. Dec. P 31,361
John PATTERSON, Marion Moshoe, Edmund Page, James Randolph
and Percy Taylor, each Individually and on behalf of all
other persons similarly situated and Equal Employment
Opportunity Commission, Appellees,
v.
The AMERICAN TOBACCO COMPANY, a Division of American Brands,
Inc., Appellant,
and
Tobacco Workers' International Union, an unincorporated
association, et al., Defendant.
John PATTERSON, Marion Moshoe, Edmund Page, James Randolph
and Percy Taylor, each Individually and on behalf of all
other persons similarly situated and Equal Employment
Opportunity Commission, Appellees,
v.
TOBACCO WORKERS' INTERNATIONAL UNION, an unincorporated
association; Local 182, Tobacco Workers'
International Union, an unincorporated
association, Appellant.
 Nos. 78-1083, 78-1084.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1979.
Decided Nov. 18, 1980.
 
 Henry T. Wickham, Richmond, Va. (John F. Kay, Jr., Stephen A. Northup, Mays, Valentine, Davenport & Moore, Richmond, Va., Paul G. Pennoyer, Jr., Arnold Henson, Bernard W. McCarthy, Chadbourne, Parke, Whiteside & Wolff, New York City, on brief), for the American Tobacco Company, A Division of American Brands, Inc.
 Jay J. Levit, Richmond, Va. (James F. Carroll, New York City, on brief), for Tobacco Workers' Intern. Union and Local 182, Tobacco Workers' Intern. Union.
 Henry L. Marsh, III, Richmond, Va. (S. W. Tucker, Randall G. Johnson, John W. Scott, Jr., Hill, Tucker & Marsh, Richmond, Va., Jack Greenberg, Barry L. Goldstein, O. Peter Sherwood, New York City, on brief), for John Patterson, et al.
 Ramon V. Gomez, Equal Employment Opportunity Commission, Washington, D. C. (Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, Washington, D. C., on brief), for Equal Employment Opportunity Commission.
 Before HAYNSWORTH, Chief Judge, and WINTER, BUTZNER, RUSSELL, WIDENER, HALL and PHILLIPS, Circuit Judges, sitting en banc.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 In these consolidated Title VII actions brought by EEOC and a class of black employees against American Tobacco Company (American) and Tobacco Workers' International Union (Union) alleging race and sex discrimination in hiring, promotion, transfer and other employment practices, the district court found violations and granted sweeping relief which, with modifications, was then approved by this court upon appeal. Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir.), cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976). Following entry by the district court of a modified judgment in conformity with our mandate upon remand, the Supreme Court decided International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); United Airlines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); and Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Asserting that these decisions constituted significant intervening changes in the law entitling them to equitable relief from the judgment, American and the Union moved under Fed.R.Civ.P. 60(b) for appropriate relief.[1] The district court denied the motion and this appeal by the defendant-movants followed. It was first heard by a panel of this court which decided that while Evans and Hazelwood did not entitle the movants to any relief from the judgment, Teamsters might, and that remand for further proceedings in light of Teamsters was required. Patterson v. American Tobacco Company, 586 F.2d 300 (4th Cir. 1978).
 
 
 2
 Upon rehearing by the court en banc, we conclude that the decision in Evans did not entitle the defendants to any relief from the judgment but that the decisions in both Teamsters and Hazelwood may require relief whose specific form can only be determined by further proceedings in the district court. Accordingly we affirm in part and vacate and remand in part for further proceedings.I
 
 
 3
 The factual background and protracted procedural history of these cases is adequately set out in our earlier opinion, 535 F.2d 257, and in the panel opinion withdrawn upon our en banc rehearing of the instant appeals, 586 F.2d 300. It need not be repeated in full here; specific details necessary to our discussion will suffice.
 
 
 4
 By way of general background, the essential features of the modified judgment from which relief by motion is now sought are here summarized. Based upon findings of violations by the defendants in transfer and promotion practices affecting non-supervisory employees and in the procedures by which supervisory employees were appointed, the judgment required American to: (1) post more definite written job descriptions when vacancies occurred; (2) eliminate lines of employment progression in six of nine job categories; (3) permit blacks in the prefabrication department in one branch to transfer to jobs in the fabrication department at another branch without losing seniority despite American's longstanding policy disallowing inter branch transfers with retention of company seniority; (4) make back-pay awards to employees unlawfully denied promotions; and (5) develop and apply objective criteria for appointing supervisory personnel. Reserved for judgment and still pending for determination in the district court were the individual claims for restitutionary back pay awards.
 
 
 5
 The defendants contend that the cited Supreme Court decisions require relief in various ways from the further enforcement of the judgment. We consider the effect of each decision in order.
 
 II
 Teamsters
 
 6
 Defendants contend that Teamsters draws in question the continued validity of those portions of the challenged judgment finding American's branch seniority system and its job lines of progression policy violative of § 703(a) of Title VII and granting related relief. The branch seniority system[2] was found violative on the basis that by imposing, without justification of business necessity, loss of seniority upon employees transferring from the lower paying prefabrication department of one branch to the higher paying fabrication department of another branch, blacks and women had been effectively locked into the lower paying positions. 535 F.2d at 263-64, 271. The lines of progression policy was found violative of Title VII in respect of six of nine protected job lines because of its demonstrated disparate impact upon protected employees and the failure to show its justification by any business necessity. Id. at 264-65, 271.
 
 
 7
 The contention is that Teamsters has now revealed that both the branch seniority system and the job lines of progression policy are immunized against challenge by § 703(h) of Title VII because they are, within contemplation of that section, "bona fide" seniority systems. We conclude that under Teamsters the branch seniority system must be held immune if bona fide within the meaning of § 703(h), and that this presents a factual issue requiring reconsideration by the district court. We further conclude that § 703(h) as interpreted in Teamsters has no application to the job lines of progression policy, so that no reconsideration of the finding of violation or of the relief granted in relation to this policy is required by Teamsters. Our reasons follow.
 
 In pertinent part, § 703(h) provides that
 
 8
 (I)t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system ..., provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(h).
 
 
 9
 When the original judgment was entered, affirmed on appeal and modified on remand, the view in this and other Circuits was, as expressed in United States v. Chesapeake & Ohio Railway, 471 F.2d 582, 587 (4th Cir. 1972), that, notwithstanding § 703(h), "seniority systems which perpetuate past racial discrimination violate (Title VII)."
 
 
 10
 Teamsters expressly rejected that view, finding it belied by the legislative history of § 703(h) and holding instead that "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination," 431 U.S. at 353-54, 97 S.Ct. at 1863-64. In holding the Teamsters seniority system immune under § 703(h), the Court emphasized that by literal terms of the statute a system's immunity depends upon its being "bona fide," and specifically pointed to the statutory requirement that differences in treatment flowing from the system's application not be "the result of an intention to discriminate because of race." Id. at 353, 97 S.Ct. at 1863.
 
 
 11
 Because the bona fides of the Teamsters system was conceded, the Teamsters Court was not, however, required to give detailed attention to the criteria by which bona fides in a contested situation is now to be determined. The Court did point out that the system before it "did not have its genesis in racial discrimination, and ... was negotiated and (had) been maintained free of any illegal purpose." Id. at 356, 97 S.Ct. at 1865 (emphasis supplied). Also emphasized were the facts that the system was facially neutral, applying alike to all employees, equally discouraging all from making intracompany transfers involving loss of seniority; and finally that the differences in employment conditions imposed by the system had a rational basis in the practices of the affected industry and were consistent with National Labor Board precedents. Id. at 355-56, 97 S.Ct. at 1864-65.
 
 
 12
 From this it is clear that the modified judgment in this case was entered under a misapprehension on the part of both the district court and this court as to the proper application of § 703(h) to claims of Title VII violation through the operation of seniority systems. At odds with our then understanding lack of bona fides may not be rested solely upon a finding of perpetuation of pre-Act discrimination. See Johnson v. Ryder Truck Lines, Inc., 575 F.2d 471 (4th Cir. 1978). Defendants are accordingly entitled to relief from that judgment to the extent the present or a reopened record shows that the "seniority system" therein found violative of Title VII is immune to challenge because "bona fide" within contemplation of § 703(h).
 
 
 13
 By their motions in the district court, the defendants contended that both the branch seniority system and the lines of progression policy were now revealed to be immune under § 703(h) because their bona fides was manifest on the record. The district court, without differentiating between the two and apparently treating them as constituting together "the seniority system" in issue, held flatly that
 
 
 14
 the seniority system of the defendants in this case is not a bona fide system under (Teamsters) not merely because it perpetuated Pre-Act discriminatory practices ... but because this system operated right up to the day of trial in a discriminatory manner. (Teamsters citation omitted). This system had a discriminatory genesis. (Teamsters citation omitted). The background of labor relations of this Company and the seniority system clearly shows this to be true. The record in this case clearly supports this finding.
 
 
 15
 Defendants, of course, challenge that conclusion. Because we consider that application of § 703(h) to the branch seniority system and to the lines of job progression policy respectively presents separate questions dictating different results, we take them up separately.
 
 A.
 
 16
 We first conclude that § 703(h) simply has no application to American's job lines of progression policy, whether or not it be considered a "seniority system" in the mode of its operation.[3] This policy was not in effect at American in 1965 when Title VII went into effect, but was only adopted in January 1968 in connection with American's general revision of its promotional policies. 535 F.2d at 263.[4]
 
 
 17
 We think that the legislative history of § 703(h), as exhaustively analyzed by the Supreme Court in Teamsters and in Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), conclusively demonstrates that Congress intended the immunity accorded seniority systems by § 703(h) to run only to those systems in existence at the time of Title VII's effective date, and of course to routine postAct applications of such systems. See Teamsters, 431 U.S. at 352, 97 S.Ct. at 1863. That history is replete with indications that the interests sought to be protected by this special exception to Title VII's general coverage of all "conditions of employment" were those seniority rights already vested in incumbent workers when Title VII went into effect.[5]
 
 
 18
 Because § 703(h) has no application to this policy, its discriminatory effect was properly assessed by the district court under the general disparate impact test laid down in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The violation then found under that test and the related relief given having been affirmed by this court, 535 F.2d at 264-66, defendants are entitled to no relief from those portions of the judgment related to American's job lines of progression policy.
 
 B.
 
 19
 There is no question that if American's branch seniority system is bona fide within contemplation of § 703(h) as interpreted in Teamsters, defendants are entitled to relief from those portions of the judgment related to inter-branch transfers. This system, unlike the lines of progression policy, was in effect when Title VII went into effect, and seniority rights were then vested under it. Opening up inter-branch transfers to protected groups of employees without loss of their branch seniority indubitably impinges retroactively upon seniority rights already vested at the critical time in employees in the transferee branch. It is this that is forbidden by § 703(h), so long as the seniority system is "bona fide." 431 U.S. at 348-55, 97 S.Ct. at 1861-64.
 
 
 20
 We turn now to the fact that the district court in ruling on the 60(b) motion expressly concluded that in light of Teamsters, American's seniority system was not bona fide. Implicit in that conclusion, earlier quoted, was the district court's understanding that, under Teamsters, American's branch seniority system would not be bona fide if it either "had its genesis" or was thereafter "maintained" for an illegally discriminatory purpose. We agree that this is Teamsters teaching. Id. at 356, 97 S.Ct. at 1865. However, we do not think that the record before the district court when it ruled upon the motion justified its specific conclusion that the system was not bona fide under this test. Certainly there are not in the record before us express findings of fact that would support such a conclusion. Whether there is evidence sufficient to support the requisite findings of fact is doubtful in view of the understanding of § 703(h)'s application that reigned in this Circuit when the original record was being made. In consequence, the present record does not permit us to conduct a principled review of the district court's ruling on this point. See Schneiderman v. United States, 320 U.S. 118, 129-30, 63 S.Ct. 1333, 1338-39, 87 L.Ed. 1796 (1943); Kelley v. Everglades Drainage District, 319 U.S. 415, 421-22, 63 S.Ct. 1141, 1144-45, 87 L.Ed. 1485 (1943); Knapp v. Imperial Oil & Gas Products Co., 130 F.2d 1, 3-4 (4th Cir. 1942).
 
 
 21
 Because the issue of the branch seniority system's bona fides only emerged in its present contours after the original record was made, we conclude that the relief invoked by defendants under 60(b) can only be achieved by reopening the record for additional proof and a new determination of bona fides in light of Teamsters.[6]
 
 III
 Evans
 
 22
 Evans held that Title VII was not violated by an employer's failure to grant retroactive seniority under its bona fide seniority system to a rehired employee who had not filed timely charges with EEOC following her earlier discriminatory discharge. Defendants here contend that Evans draws in question the continued validity of the district court's judgment to the extent it finds violations of Title VII and grants relief related to defendants implementation of its 1968 promotional system, because no timely challenge to that system was filed with EEOC when the system was adopted. We conclude that Evans is inapposite to the facts of this case and hence requires no modification or reconsideration of the judgment.
 
 
 23
 In Evans the Court specifically rejected the employee's claim that the failure to accord her retroactive seniority benefits constituted a "continuing violation" that was not time-barred. Rejection was on the basis that the seniority system itself was not charged or proven to constitute an existing violation of the claimants' rights to nondiscriminatory conditions of employment. In the instant case, by contrast, the violations charged and found by the district court were "continuing" in the very sense not present in Evans. Here the promotional policies adopted in 1968 were alleged by the claimants, found by the district court, and affirmed by this court to involve a continuing pattern or practice of discrimination that locked black and women employees into less favorable job positions. These effects, unlike the denial to the Evans claimant of retroactive seniority benefits, constitute truly "continuing" violations of Title VII. Hence, claims related to these violations are not barred by failure to have challenged at its inception the policy which gave continuing rise to them.
 
 IV
 Hazelwood
 
 24
 Defendants contend that Hazelwood undercuts the basis upon which discrimination was found in appointments to supervisory positions at the Richmond and Virginia branches, and that they are accordingly entitled to relief from related portions of the judgment. While we do not believe that Hazelwood requires full relief from the judgment on the present record, we conclude that it does require remand for reconsideration.
 
 
 25
 Hazelwood made two critical clarifications in Title VII doctrine that might significantly have affected the district court's original assessment of the evidence, its resulting judgment, and this court's initial review of that judgment. The first has to do with the relevant time period within which discrimination is to be assessed; the second, with the assessment of statistical proof in respect of jobs claimed by the employer to require special qualifications or skills. For reasons that follow, we conclude that the judgment under attack is not supportable on the present record under a fair application of these principles from Hazelwood, and that their proper application can only be insured by reconsideration of the evidence related to the supervisory positions on a reopened record in the district court.[7]
 
 
 26
 The district court's original finding of discrimination in appointments to the supervisory positions was based entirely upon plaintiff's statistical proof. This showed substantial current disparities between the percentages of blacks and women in the general population of the Richmond SMSA[8] and those employed in supervisory positions by American in its Richmond and Virginia branches[9] and, again, between the percentages of black and women employees in lower level positions at American and those employed in supervisory positions by American in its two branches. Taking into account that the supervisory positions had been filled partially by hiring from outside and partially by promotion and transfers from within American's work force, the district court concluded that a violation of Title VII in filling these positions had been established by plaintiff's statistical proof. The district court considered but was unpersuaded by defendants' statistical evidence offered to rebut plaintiff's prima facie case. That evidence consisted of two elements favoring defendants' position that were then and now contended to be more probative on the issue than plaintiff's statistical evidence: statistical data showing the percentages of women and blacks categorized as "supervisors" in the SMSA figures compared with the percentages of blacks and women employed in supervisory positions at American; and statistical data showing the overall course of American's appointments to vacant supervisory positions since the effective date of the Act.
 
 
 27
 While the record is not wholly clear on the point, we are persuaded that the district court gave little, if any, consideration to these elements of defendants' proof, presumably for the very reason that Hazelwood had not then made plain their great importance in assessing proof of discrimination in this type case. Our reasons for this conclusion require brief analysis of Hazelwood's specific teaching on the relevant issues and of the district court's order denying the Rule 60(b) motion.
 
 
 28
 As we recently pointed out in EEOC v. Radiator Specialty Co., 610 F.2d 178 at 185 (4th Cir. 1979), Hazelwood and its recent progeny have now confirmed the inappropriateness in the usual case of using general population and general work force statistics as base data for establishing discrimination in respect of hiring and promoting to job positions requiring special qualifications "not commonly possessed or readily acquired." In the instant case, it seems obvious that in the pre-Hazelwood setting both the district court in entering original judgment and this court in review simply assumed the appropriateness of using plaintiffs' general population and general work force statistics as the base data for comparison with American's employment of blacks and women in supervisory positions. On the district court's part this may have been because it rejected American's contention that special qualifications existed. If so, the record does not indicate that this was the basis for the court's reliance upon plaintiffs' statistics, nor would such a conclusion have been supported on that record. The question whether special qualifications in the Hazelwood sense did or did not exist for these positions could not be resolved as a matter of law on the basis of the opposing parties' bald conflicting assertions, nor by looking simply to the manifest nature of the positions, but required a factual inquiry whose necessity was not then realized. See EEOC v. Radiator Specialty Co., 610 F.2d at 178 at 185. That factual inquiry is required now to assure compliance with Hazelwood's teaching on the appropriate use of statistical evidence to establish and to rebut a prima facie case of discrimination.
 
 
 29
 It is equally obvious that the district court and this court in the pre-Hazelwood setting failed to assess the evidence with appropriate regard for the relevant time period for inquiry as that too has now been clarified in Hazelwood. Basically, Hazelwood teaches on this point that the relevant period commences no earlier than the effective date of the Act.[10] This has two critical consequences. It makes irrelevant to the establishment of a prima facie case any evidence, including statistical data, related to pre-Act employment acts.[11] Perhaps more critically, it permits an employer effectively to rebut a prima facie statistical showing of discrimination in a current, static employment situation by showing that within the critical post-Act time frame its employments acts have been non-discriminatory. Thus, an "employer who from (the effective date of the Act) forward made all its employment decisions in a wholly non-discriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes." 433 U.S. at 309, 97 S.Ct. at 2742.
 
 
 30
 In considering on the 60(b) motion whether Hazelwood required relief from the judgment, the district court took the view that its only possible relevance was "on the question of whether the defendant should have been allowed to put on evidence to rebut the plaintiffs' prima facie case." As to this, the court pointed out, the defendants had been "allowed and they did, put on a substantial amount of evidence in an unsuccessful attempt to rebut the prima facie case." Therefore, the court concluded, "Hazelwood ... is inapplicable to these cases." Jt.Supp.App. at 23. As our discussion has indicated, Hazelwood goes well beyond simply authorizing the presentation of rebutting proof by an employer, and touches in critical ways upon the appropriate mode of assessing the total proof adduced by both sides. Our review of the record, including of course the district court's expressed perception of Hazelwood's impact, persuades us that reconsideration of the evidence on a reopened record is required in order fairly to determine whether the judgment can stand in light of Hazelwood.[12]
 
 
 31
 As earlier indicated, it is clear in the first place that the question of special qualifications for the supervisory positions must be determined as a prelude to proper assessment of the statistical evidence. If it is determined that no special qualifications beyond those commonly possessed or readily acquired are involved, then general population and work force statistics within the relevant time period may appropriately be used to determine whether plaintiffs' evidence of record establishes a prima facie case.[13] If it is determined that special qualifications in this sense do exist, then the most probative evidence will be qualified market data,[14] and general population and work force data may be found not appropriate as the basis for statistical comparison.[15] In the latter event, plaintiffs should be allowed on the reopened record to adduce any evidence of qualified market data available to them. See EEOC v. Radiator Specialty Co., 610 F.2d at 178, 185.
 
 
 32
 Next, in assessing defendants' rebutting evidence, whether on the present or a reopened record, proper weight must be accorded its tendency to show nondiscrimination in post-Act employment decisions, notwithstanding the inference of discrimination permissible under Griggs from plaintiffs' statistical proof of a prima facie case. In order fairly to assess defendant's efforts at rebuttal, it would seem necessary to establish on a reopened record the details of the relatively small number of post-Act appointments (apparently around 30 in number) to supervisory positions: the approximate dates when vacancies were filled, the race and sex of each appointee, and whether appointment was by promotion from within or hiring from without. Only so can a valid statistical comparison within the relevant labor pool be made.
 
 V
 
 33
 For these reasons, the order of the district court denying on their merits the motions of American and the Union for relief under Fed.R.Civ.P. 60(b) is affirmed in part and vacated and remanded in part for further proceedings consistent with this opinion.
 
 
 34
 AFFIRMED IN PART; VACATED AND REMANDED IN PART.
 
 
 35
 WINTER, Circuit Judge, concurring and dissenting:
 
 
 36
 I concur in the majority opinion of the in banc court with respect to its treatment of the Teamsters and Evans issues both for the reasons set forth therein and the reasons expressed in the majority panel opinion, Patterson v. American Tobacco Company, 586 F.2d 300 (4 Cir. 1978) (Patterson II). I dissent from the majority's application of the Hazelwood principles to the instant case and from the remand for further proceedings under Hazelwood both for the reasons expressed in the majority panel opinion and those that follow. In my view the present record conclusively shows that the requirements of Hazelwood have been amply met. American has had at least one opportunity to demonstrate otherwise. It did not avail itself of that opportunity and the court should proceed to final disposition without further delay.
 
 I.
 
 37
 I agree that under Hazelwood an employer may successfully rebut a plaintiff's prima facie case, which plaintiff established by proving that the percentages of women and blacks employed as supervisors is disproportionately low to the percentages of women and blacks in the available labor pool, by showing that the percentages of women and blacks categorized as "supervisors" in the SMSA figures compared favorably with the percentages of blacks and women employed in supervisory positions by the employer. But, as I understand the law, resort to the "supervisors" statistics in the SMSA figures is predicated upon a showing by the employer that the supervisory positions require special qualifications "not commonly possessed or readily acquired" by the general labor force. EEOC v. Radiator Specialty Co., 610 F.2d 178, 184 (4 Cir. 1979) (emphasis added). If such a showing is not made, the appropriate statistics to be considered are those of the available labor force. I also agree that Hazelwood teaches that the relevant period for determining discrimination in hiring or promotion is not earlier than the effective date of the Title VII (July 2, 1964).
 
 
 38
 On the question of the statistics to which the court should turn to decide if plaintiffs' prima facie case was rebutted, I think that the stipulation of the parties, made June 24, 1974, supplies the answer. The parties stipulated:
 
 
 39
 56. Prior to selecting an employee for promotion to a supervisory position the defendant Company gives the local union an opportunity to make recommendations.
 
 
 40
 57. The defendant Company has never had an educational requirement for employees promoted from hourly production jobs to supervisory positions.
 
 
 41
 58. Hourly employees of the defendant Company do not have to apply or express their interest in holding a supervisory position in order to be considered for promotion to such a position.
 
 
 42
 59. The defendant Company does not have any written guidelines which are used in selecting supervisory personnel.
 
 
 43
 60. The selection of supervisors at the Richmond and Virginia Branches of the defendant Company is left to the discretion of those employees at the superintendent and manager levels of plant management.
 
 
 44
 I would think it obvious that if American permits a union to nominate candidates for promotion, if it imposes no education requirement for employees promoted from hourly production jobs to supervisory positions, if it does not require a showing of employee interest as a condition of promotion and if it has no written guidelines for selecting supervisory personnel, relying instead on the unbridled discretion of higher supervisory personnel, there is no requirement that employees hired for supervisory positions possess skills or special qualifications not commonly possessed or readily acquired. Even if, as the majority speculates, the district court simply assumed the appropriateness of using general population and general work force statistics as the base data for comparison with American's employment of blacks and women in supervisory positions, that assumption was manifestly correct. Irrespective of whether the district court in its original decision or in its decision on remand articulated the reason for its result with the legal nicety that the majority would prefer, I see no point in returning the case.
 
 
 45
 It should be remembered also that, while the district court was reconsidering its decision on remand, Hazelwood had been decided. Our direction to the district court gave American full opportunity to tender proof of the special qualifications which it believed that it was necessary that its supervisory personnel possess.[1] American failed to offer any evidence other than that already contained in the record. Instead it stated to the district court both in writing and in the oral statements of counsel that the present record was sufficient and the issue to be decided was purely legal. Moreover, before us, American relies on SMSA statistics which have little relevance to the tobacco industry; namely, statistics derived from construction craftsmen, mechanics and repairmen, machinists, metal craftsmen, and other craftsmen. Thus from lack of proof of the need for special qualifications, despite an opportunity to offer such proof, and general inappropriateness of the statistical data asserted to support American's position, I would conclude that the only relevant evidence on the factor in question is the stipulation of the parties which, as I have shown, established that special qualifications are not required. Since there was no necessity of special qualifications, the correctness of the district court's factual determinations is unimpeached and there is no need for a second remand.
 
 II.
 
 46
 I also see no need to remand for a consideration of post-Act employment decisions for, as I view the record, under any test plaintiffs' prima facie case was not rebutted.
 
 
 47
 During the post-Act period to the date of trial, American hired or promoted approximately 85 persons to supervisory positions at the Virginia and Richmond branches, 55 at Virginia and 30 at Richmond.[2] Of this number, 34% (27) were promoted and the rest were hired from the outside. At the Virginia branch, 6 of the 55 supervisory appointments were of blacks-10.8% of the total supervisory appointments. At the Richmond branch, 3 out of 30 supervisory appointments were of blacks-10% of the total supervisory appointments. Both of these figures are below the percentage of blacks in even the Richmond SMSA supervisory workforce (12%), and more markedly so with respect to the proportion of blacks in the overall workforce (23.6%).[3] Thus, to me, the evidence of post-Act hirings and promotions to supervisory positions confirms and does not rebut the plaintiff's prima facie case of racial discrimination in post-Act recruitment of supervisory personnel.
 
 
 48
 There is further support for this conclusion in an analysis of the appointment dates of the black supervisors. Of the 9 black supervisors at the Richmond and Virginia branches at the date of trial, 5 were not made supervisors until after January 3, 1969, when EEOC charges were filed. Since one black supervisor had been appointed prior to the effective date of Title VII, this means that American voluntarily appointed only 3 black supervisors during the period that its compliance with the law is to be measured.
 
 III.
 
 49
 In the light of my views, it could be asked why I do not join in the majority in banc opinion since I agree that remand under Teamsters is required and the record is such that plaintiffs will prevail on both issues on remand under Hazelwood. The short answer is that this litigation has proceeded at a regrettably slow pace to date. The ultimate relief to those of the plaintiffs entitled to back wages has long been denied. Conversely American has been afforded a full and fair opportunity to show how Hazelwood should change the course of this litigation and it has failed or been unable to meet the burden resting on it. I do not think that the ultimate decision in this case on any issue should be delayed any longer than is absolutely necessary. Since I see no viable issue under Hazelwood, I would not complicate the remand by interjecting this issue.
 
 
 50
 Judge Butzner authorizes me to state that he joins in this opinion.
 
 
 51
 WIDENER, Circuit Judge, concurring and dissenting:
 
 
 52
 * I concur in the result reached by the majority in part II-B of its opinion, as well as in part IV thereof.
 
 II
 
 53
 As to part III of the majority opinion concerning the application of Evans, I respectfully dissent for the reasons I have stated in my dissenting opinion at 586 F.2d page 310.
 
 III
 
 54
 I respectfully dissent to part II-A of the majority opinion for the reasons I will set out below.[1]
 
 
 55
 The lynchpin of the majority's holding, that § 703(h) has no application, is this statement found on page 749:
 
 
 56
 "This policy (lines of progression) was not in effect at American in 1965 when Title VII went into effect, but was only adopted in January 1968 in connection with American's general revision of its promotional policies, 535 F.2d at 263."
 
 
 57
 I have read page 263 of that opinion from beginning to end, and, with respect, cannot read into it the meaning given by the majority which I have just quoted. Indeed, that opinion indicates, if anything, the lines of progression were in existence at least as early as 1963. 535 F.2d at 271. I think the source of the majority's statement is more likely an uncritical acceptance and erroneous interpretation of stipulation 38 filed in the district court, to which I will later allude. In all events, without the accuracy of the quoted statement, the opinion of the majority, that § 703(h) has no application, is without foundation. I think the record is uncontradicted and compelling that the factual statement is demonstrably wrong.
 
 
 58
 In this case, the pretrial discovery, the trial, and the district court's decision all occurred prior to the Supreme Court's decision in Teamsters. Therefore, it was not material whether or not the lines of progression existed prior to 1965 (the effective date of the Act). It is thus not surprising that the district court's findings of fact do not address this issue directly and can be read in two ways.[2] The majority today simply assumes the lines of progression were created in 1968. Not only is this assumption not correct, but the full record clearly demonstrates that in 1968 lines of progression were eliminated, except for the nine lines at issue here which already existed and which were merely acknowledged as pre-existing exceptions to the posting and bidding system. On remand, the district court should if necessary take additional evidence, and in all events issue findings of fact on the origins of the lines of progression.
 
 
 59
 The full record, even as it now stands, is replete with evidence that the lines of progression existed for many years prior to the effective date of the Act.[3] The Company did not, and still does not, use the terminology "lines of progression." The Company does use the term "qualifications" to describe what are in fact lines of progression; that is, one became "qualified" for a job at the top of the line by first holding a job nearer the bottom of the line. The district court found as a fact that both prior to and after the effective date of the Act, job qualifications "referred to whether or not an employee had filled a particular job before and was in the opinion of supervisory personnel, familiar with it." Finding of Fact Number 8. (Appendix II 8 EPD, P 9722, p. 6012, E.D.Va.1974.)
 
 
 60
 Of plaintiffs' First Interrogatories to Defendant American Tobacco Company, interrogatory number 7 calls for an explanation of "the basis or rationale for each line of progression ... and each change therein described in answer to interrogatory 6...." (Record, v. I, pp. 47, 50-51.) The answer refers to a list of jobs "with qualifications other than seniority." The answer goes on to explain:
 
 
 61
 This means simply that an individual has to bid for, and qualify on, the lower paid job first in each case before that person may bid for, and qualify on, the higher paid job. The criterion for requiring these "qualifications" is based squarely on the necessity of learning the first job before being able to adequately perform the next one even after the regular training period.
 
 
 62
 (Record, v. I, p. 287.)
 
 
 63
 The list of jobs referred to (which became Plaintiffs' Exhibit 35M) is titled "EXPLANATIONS OF CLASSIFICATIONS WITH QUALIFICATIONS OTHER THAN SENIORITY IN ANSWER TO QUESTION 7." The list then describes each line of progression (Learner Adjuster to Adjuster, Operator to Learner Adjuster, Catcher to Examiner-Making, etc.) and gives a detailed explanation of the rationale for each one. It is beyond question that the Company used "qualifications" as a synonym for lines of progression.
 
 
 64
 Interrogatory 6, referred to in interrogatory 7 (see supra ), reads in relevant part:
 
 
 65
 6. Describe in detail all changes in the composition or structure of departments and lines of progression, or in any job, including the creation, elimination, merger, or restructuring of any department, line of progression or job which occurred between January 1, 1960 and the date these interrogatories are answered.
 
 
 66
 (Record, v. I, p. 50.)
 
 American's answer was dated July 26, 1973:
 
 67
 6. The significant changes in departments patterns of movement (sic), etc., which have taken place since January 1, 1960, are as follows:
 
 
 68
 (b) The elimination of qualifications (except as noted in answer to question 5) with the establishment of seniority as the sole criterion for permanent promotion to be effected through the posting and bidding system in the contract of 1968 as agreed between the company and the Union.
 
 
 69
 (c) ... By 1968 the Company and the Union negotiated the elimination of qualifications except in the few jobs mentioned in answer to Question 5.
 
 
 70
 (Record, v. I, pp. 269-270)[4] (italics added).
 
 
 71
 Since the answer describes the reduction in the number of lines of progression which occurred in 1968 but does not indicate the creation of any lines, the lines existed on and before January 1, 1960. The lines of progression were not created in 1968, as the majority assumes; they were eliminated in 1968, with the exception of the few at issue here. These few existed well before the effective date of the Act, and were not eliminated in 1968 when the rest were.
 
 
 72
 The Company provided two sets of answers to each interrogatory, one for the Richmond Branch and one for the Virginia Branch. The answer to interrogatory 6 quoted above is for the Richmond Branch. The answer for the Virginia Branch contains a paragraph identical to paragraph (b) quoted above, and also adds:
 
 
 73
 By 1967, the pattern of downward movement, principally of whites, had slowed somewhat, a few new hires were taken in, some whites elected voluntary layoff status rather than do some of the pipeline jobs, and the Company and the Union negotiated the elimination of qualifications except in those few jobs mentioned in answer to question 5.
 
 
 74
 (Record, v. I, p. 287) (italics added).
 
 
 75
 The Answer to interrogatory 7 quoted above is for the Virginia Branch. The Richmond Branch answer reads: "7. Refer to Virginia Branch answers, same information is applicable. (Note only classifications of Adjusters and Learner Adjusters apply to Richmond Branch.)" (Record v. I, p. 270).[5] Lines of Progression were in existence prior to 1960, and all but the nine[6] at issue here were eliminated by 1968.[7]
 
 
 76
 It is more than merely interesting to recognize that the named plaintiff, John Patterson, filed his charge not because he would not enter a line of progression as may be inferred from the various majority opinions filed in this case but because the line of progression that he was in was eliminated in 1968. Although a description of his line of progression, like the others, was not formally reduced to writing, Patterson and everyone else knew about it, relied on it, and Patterson was understandably upset when it was eliminated. Patterson had been a factory supply handler, and there had been a line of progression from that position to the position of machine operator. Supply handlers were trained to be operators, and part of their job as supply handler was to relieve the operator. In this manner handlers gained one or two hours of experience a day as operators. (Record, v. XVII, pp. 68-73, 105-106, 118; v. XXV, p. 56; v. XVIII, p. 57D; v. XIX, p. 4-5 (deposition of Foreman Barnes); v. XXXVIII, p. 18 (deposition of employee Howard); v. XXXIV, pp. 43-44, 53-59-60 deposition of Foreman Thomas); v. V, pp. 135-136 (Trial Transcript); v. VII, pp. 627-631 (Trial Transcript)). Patterson gave the following testimony at his deposition:
 
 
 77
 Q. Did you file a charge of discrimination with the EEOC?
 
 
 78
 A. Yes.
 
 
 79
 Q. I believe it was in 1968. Can you recall the specific charge that you made at that time?
 
 
 80
 A. Yes.
 
 
 81
 Q. What was that?
 
 
 82
 A. Well, the charge was that they had-you want me to go into detail on it?
 
 
 83
 Q. Be fine.
 
 
 84
 A. Well, I had put in my time for my hours of receiving a machine, which was supposed to be nine hundred hours, and in the meantime after we put in that nine hundred hours they gave out some machines, but they dipped back across from the agreement they made. They changed the agreement.
 
 
 85
 Q. Was this in 1968?
 
 
 86
 A. In '68.
 
 
 87
 Q. Do you recall the employees who got those promotions following the posting?
 
 
 88
 A. No, I don't recall that either.
 
 
 89
 Q. If I told you they were James Starkes, Isaiah Jones, Milton Branch and Andrew Yancey, would that refresh your memory?
 
 
 90
 A. Well, that seems like the four that were brought over after we had served our nine hundred hours. I say that seemed like the four.
 
 
 91
 Q. And they were all senior employees to you, were they not?
 
 
 92
 A. Yes, they were senior.
 
 
 93
 Q. And they were all black employees, were they not?
 
 
 94
 A. Yes.
 
 
 95
 Q. Now, as I understand it, the only claim of discrimination that you made so far as your testimony in response to Mr. Wickham's question is that you had accumulated 900 hours on the machine, is that correct?
 
 
 96
 A. Right.
 
 
 97
 Q. And that you didn't get a job as a machine operator, is that right?
 
 
 98
 A. Right.
 
 
 99
 Q. There was no other claim of discrimination that you are making?
 
 
 100
 A. Not for me.
 
 
 101
 Q. Who discriminated against you?
 
 
 102
 A. From what I understand, they changed the rule in the middle of the stream and I got hurt.
 
 
 103
 Q. How did they change the rule?
 
 
 104
 A. Well, from the way I look at it, they changed the rule when they reached over and got those four men and put them into jobs like that and left the other men that had accumulated the hours with the less seniority outside.
 
 
 105
 Q. Those four men were black men, weren't they?
 
 
 106
 A. Yes.
 
 
 107
 Q. This is what you mean when you say you were discriminated against?
 
 
 108
 A. Yes.
 
 
 109
 (Record, v. XXV, pp. 20-21, 23, 36, 27.)
 
 
 110
 Mr. Dillard (manager), in his trial testimony, confirmed that this was the basis of Patterson's charge. (Record, v. VIII, pp. 982-982, 1035.) The elimination of this line of progression in 1968 (from factory supply handler to machine operator) formed the basis of Patterson's charge. Patterson was in a line of progression, but when this line was eliminated and replaced with a posting and bidding system, others with more seniority got the vacancies.
 
 
 111
 Taylor, another named plaintiff, also filed a charge with the EEOC, alleging that his seniority rights were violated. His complaint is identical to Patterson's. He had acquired 900 hours' experience as an operator, but when that line of progression was eliminated in 1968, four other blacks with more seniority got the position(s) he wanted. (Record v. XXV, pp. 72-82 (Taylor's deposition); v. XXXVIII, pp. 7-11, 18 (deposition of Howard, a black Union officer who has been with American since 1946); v. VIII, pp. 982-984, 1035 (Dillard's trial testimony)).
 
 
 112
 Every contract between American and the relevant locals of the Tobacco Workers' International Union clearly recognized that for some promotions, "qualifications" were necessary. Article 8 of the Union contract, for example, signed on November 4, 1959 (effective January 1, 1960) contains the following:
 
 
 113
 All promotions and demotions shall be made in accordance with seniority provided that, in the opinion of the Management, there is no question as to the qualifications and efficiency of the employee concerned. (Italics added)
 
 
 114
 Identical or very similar clauses were included in every contract since then (no earlier contracts appear to be in the record). (See Record, v. XIV, Plaintiffs' Exhibit 35FF, Union Contracts effective January 1, 1962 (including amendment of Oct. 27, 1964); January 1, 1965; January 15, 1968; January 15, 1971.) These contracts, interpreted in light of the district court's finding on the meaning of "qualifications," show that at least since 1960, a promotion to certain jobs depended on whether or not the candidate "had filled a particular job before." This describes the essence of a job line of progression. Indeed, we so described it in the first panel opinion in nearly the same words. 535 F.2d at 265. The 1968 and 1971 union contracts continued to use the terminology "qualifications." They did not use the phrase "lines of progression," nor did they identify which jobs are in lines of progression.
 
 
 115
 Plaintiffs' Exhibit # 56 indicates which jobs, at the Virginia Branch, required "qualifications" in 1963 if not earlier. The exhibit lists 82 job classifications in which, as of September 1963, vacancies were filled by "the same system of filling vacancies (promotions) as the Richmond Branch, i. e., no qualifications, plantwide seniority only." That list of 82 jobs does not include any of the nine jobs at issue here (adjuster, learner adjuster, examiner-making, examiner-packing, ADT dryer operator, textile dryer operator, overhaul adjuster, adjuster-prefabrication, and turbine operator). The sentence immediately following that list reads:
 
 
 116
 From September 16, 1963 to January 15, 1968 promotions to the remaining job classifications at Virginia Branch required plant-wide seniority and qualifications, with "qualifications" prevailing over seniority.
 
 
 117
 This clearly shows that at least as early as 1963, in order for an employee to get promoted to one of the nine jobs at issue here (as well as others), the employee had to have filled a particular job before. Lines of progression existed at least as early as September 16, 1963. See also Record, v. V, pp. 84-87.
 
 
 118
 The record is replete with evidence that as far back as the 1950's, for the jobs at issue here and for others, an employee had to work in the lower paying job before being promoted to the higher paying job. One of the nine lines that was recognized as an exception to the posting and bidding system is the line from catcher to examiner (Stipulations 38, 41). The deposition of S. Kirby, who started with American in 1952 as an Assistant Foreman, shows the following:
 
 
 119
 Q. During that period of time (from 1952 to 1957), what type of qualifications did you have to have to become an examiner?
 
 
 120
 A. You would have to be an experienced catcher.
 
 
 121
 (Record, v. XVI, pp. 28-29; see also Id., p. 52.)
 
 
 122
 The deposition of John Dillard, Manager (Record, v. XVII, p. 95), includes his statement that "To my knowledge, all of our examiners in the Making Department, at one time or another have been a catcher." Thus, the line of progression from catcher to examiner existed in the 1950's and was not "adopted" in 1968.
 
 
 123
 The progression from operator to learner adjuster was also excepted from the general posting and bidding system. (Stipulations 38 and 40, 8 EPD at p. 6010.) John Dillard started with American in 1940 as a factory clerk and worked his way up to become Manager in 1961 (which position he still held in 1973, the date of his deposition). (Record, v. XVII, pp. 4-6.) Dillard's deposition contains the following:
 
 
 124
 Q. To your knowledge, have there ever been any learner adjusters who haven't been operators?
 
 
 125
 A. To my knowledge, all of our learner adjusters have come from the operating classification.
 
 
 126
 (Record, v. XVII, p. 94, emphasis added.)
 
 
 127
 E. B. Barnes started with American Tobacco in 1943 as a hopper filler and tote boy, and worked his way up to become foreman by the time his deposition was taken. (Record, v. XX, pp. 3-5.) The following exchange took place at Barnes' deposition:
 
 
 128
 Q. In order for a guy to be an adjuster, would it be an advantage for him to be a maker or packer operator?
 
 
 129
 A. Oh, definitely, yes, definitely. It is almost a must. You put somebody on there to make an adjuster out of him, it would be like trying to take me and make me an engineer without giving me an education.
 
 
 130
 Q. Do you know of any situations since you have been there where a making adjuster is put to work without being an operator first?
 
 
 131
 A. I don't recall any. I don't know of any. I don't know of any.
 
 
 132
 Q. Is there any rule that says you have to be one?
 
 
 133
 A. I think this is one of the things that goes on the posting notice when they post, to say the qualifications are that you are an operator. If it was making adjuster, that you were a making operator, etc.
 
 
 134
 (Record, v. XX, pp. 84-85.)
 
 
 135
 While the Virginia Branch had nine lines of progression, the Richmond Branch had lines leading to only two positions, learner adjuster and adjuster. (Stipulation 38, supra.) W. F. Miller, assistant manager of the Richmond Branch, testified at trial as follows:
 
 
 136
 Q. Now, under that departmental seniority, were there any other qualifications (f)or promotions during that period, other than seniority, departmental?
 
 
 137
 A. This was still prior to-
 
 
 138
 Q. Prior to 1963?
 
 
 139
 A. No, sir. The only qualifications were people that were interested and could learn the job. Other than we had one of our qualifications on the line of the progress.
 
 
 140
 Q. The line of progression?
 
 
 141
 A. The line of progression; that you had to be a packing machine operator before you became a learner adjuster.
 
 
 142
 Q. And a learner adjuster before you became an adjuster?
 
 
 143
 A. Yes.
 
 
 144
 Q. That line of progression is still in effect?
 
 
 145
 A. Yes, it is.
 
 
 146
 Q. And it has been even since prior to the merger?
 
 
 147
 A. Yes, sir.
 
 
 148
 (Record, v. VII, Trial Transcript, pp. 868-869.
 
 
 149
 The merger referred to is obviously the merger of the two union locals which took place on September 16, 1963.)
 
 
 150
 H. Nuckols, Jr. was Machine Shop Foreman from 1955 to 1969. He also testified at trial:
 
 
 151
 Q. And what are the qualifications for becoming a learner adjuster?
 
 
 152
 A. The basic qualification is that he have been a operator, machine operator, a packer, or making machine operator.
 
 
 153
 Q. Why is this necessary?
 
 
 154
 A. Well, I would think it would be necessary in order that he would become somewhat familiar with the machine. That is just one of the regulations they have had down through the times that they have always used....
 
 
 155
 Q. Now, sir, in order to become an adjuster, is it correct to say that you must serve as a learner adjuster first?
 
 
 156
 A. Yes.
 
 
 157
 (Record, v. V, Trial Transcript pp. 241-242; italics added.)
 
 
 158
 Nuckols further testified that to his knowledge, every adjuster and learner adjuster has served as either a packing or making machine operator (Id. at 244) and that this requirement was a prerequisite (Id. at 267).
 
 
 159
 G. A. Howard started with American in 1946 as a general laborer, and was a learner adjuster when his deposition was taken. He confirmed that prior to 1968 the "qualification(...)" for learner adjuster was to have been an operator. (Record, v. XXXVIII, p. 19.) Foreman O'Brien, in his deposition, also confirmed that prior to 1968 adjusters were first operators. (Record, v. XIX, p. 38.)
 
 
 160
 Indeed, at least as early as 1963, the required qualification for "progressing" from operator to learner adjuster to adjuster existed and was used to fill even temporary vacancies. Referring to the period from 1963 to 1968, Dillard gave the following testimony at trial:
 
 
 161
 Q. What about your adjusters? Were they handled in the same way as your machine operators?
 
 
 162
 A. The adjusters followed a progression that led to the job. They had previously been an operator-
 
 
 163
 Q. I am only talking about temporary vacancies now.
 
 
 164
 A. Yes. I am telling you about temporary vacancies. They had been an operator, and then they had been a learner adjuster, and then they had been an adjuster.
 
 
 165
 Q. And you filled the temporary vacancy in one of those jobs by getting someone who had previously done the job?
 
 
 166
 A. We had a list of people, and the list was set up by seniority and qualifications, and we used the list.
 
 
 167
 (Record, v. V, Trial Transcript, pp. 122-123.)
 
 
 168
 The EEOC, in its Post-Trial Brief, states that "qualifications" were used in the canvassing method of filling temporary vacancies "From 1963 to 1968." EEOC's Post-Trial Brief at 35 (Aug. 7, 1974). It is clear from the uncontradicted testimony at trial and in depositions introduced into evidence that the line of progression from operator to learner adjuster existed for many years prior to 1968, and prior to the effective date of Title VII.
 
 
 169
 The same is true of the progression from learner adjuster to adjuster. This line was also recognized as an exception to the posting and bidding procedure. (Stipulations 38, 39, 8 EPD at p. 6010.) Dillard's deposition includes the following:
 
 
 170
 Q. Have there ever been any adjusters who haven't been learner adjusters?
 
 
 171
 A. I don't positively know the answer to that question. In recent years, I know that-and when I say recent years, I mean in the last twenty-five years or so-all of the adjusters have come from the learner adjuster grouping.
 
 
 172
 (Record, v. XVII, p. 94, emphasis added.)
 
 Employee Kirby's deposition includes:
 
 173
 Q. During that period of time from '57 to '62, again, how did someone become an adjuster?
 
 
 174
 A. Someone would have become a learner adjuster before he would have become an adjuster.
 
 
 175
 (Record, v. XVI, p. 42.)
 
 
 176
 Miller's trial testimony, quoted supra, confirms that prior to 1963 one had to be a learner adjuster before becoming an adjuster. Nuckols' trial testimony, also quoted supra, provides further confirmation that the line of progression from learner adjuster to adjuster existed well prior to the effective date of Title VII.
 
 
 177
 Indeed, the plaintiffs argued that the "qualification" of being a learner adjuster before becoming an adjuster has "always" existed. The Plaintiffs' Memorandum in Opposition to Defendants' Motion to Amend and Supplement Findings of Fact and Conclusions of Law (Record, v. IV, p. 211) includes the following response to the defendants' proposed Supplemental Finding # 5:[8]
 
 
 178
 5. Supplemental Finding # 5 is adequately covered in the Court's Finding # 8. The Company's suggested supplement is incorrect, e. g. the Richmond Branch has always required its TWIU "adjusters" to hold the position of "learner adjuster." In addition the Virginia Branch maintained "lines of progression" as recently as the date of trial. (Stipulations Nos. 39-47.) (Id., emphasis added.)
 
 
 179
 Here, then, even the plaintiffs allege that the learner adjuster-adjuster line of progression "has always" existed at the Richmond Branch.[9]
 
 
 180
 The posting and bidding system instituted in 1968 also recognized an exception for the progression from line searcher to examiner-packing. (Stipulations 38 and 42, 8 EPD, p. 6010.) The Dillard deposition includes:
 
 
 181
 Q. All right, sir. It is my understanding, also, that in order to become an examiner in Packing, you should have been a line searcher, is that correct?
 
 
 182
 A. Yes, sir, that is correct.
 
 
 183
 Q. Have there ever been any examiners who haven't been line-
 
 
 184
 A. I am not really sure of this one. I know that we have not had any examiners that haven't been line (searchers) at some time in recent years.
 
 
 185
 (Record, v. XVII, p. 96; by "recent years" he means within the last 25 years, Id., p. 94.)
 
 
 186
 The Dillard deposition also indicates that the boiler operator to turbine operator line of progression has existed for at least fifteen or twenty years. (Record, v. XVII, pp. 100-101; see Stipulations 38 and 47, 8 EPD, p. 6010.)
 
 
 187
 Finally, even the EEOC claims that "qualifications" were used, not after 1968, but "until 1968." Plaintiff-Equal Employment Opportunity Commission's Post-Trial Brief at 33. Plaintiffs, John Patterson, et al., agree. In their separate post-trial brief, they claim that qualifications were part of "The American Tobacco Company's Promotional Systems Which Were In Effect Prior to January 15, 1968." Post Trial Brief of Plaintiffs John Patterson, et al., at 62 (emphasis added). Indeed, that brief at that page indicates the system of "qualifications" was instituted "(f)ollowing the merger ... on September 16, 1963 ...," as does the EEOC brief quoted last above. The only reasonable meaning to "following" is just following.
 
 IV
 
 188
 It is acknowledged that the majority holding as to the effect of § 703(h) on the lines of progression within the seniority system is based entirely on the fact that the lines did not exist in 1965. I maintain this fact is simply not in the record.
 
 
 189
 Because the question of exactly when the lines of progression were initiated is so important in this case and was never made such an issue of in the district court or in the previous hearings in this court, I am of opinion the remand order should include a direction to inquire into the lines of progression to ascertain when and under what circumstances they came into being.
 
 
 190
 I doubt that it is fair to the plaintiffs to decide the question on the record before us now, but should we so do, the record is uncontradicted that the lines of progression came into being at the very latest just following the merger of the two unions in 1963, almost two years before the effective date of the statute.
 
 
 191
 Should such an inquiry disclose that which the record tends to show, that the lines of progression were instituted prior to the effective date of the statute, then the district court should further inquire as to their bona fides.
 
 V
 
 192
 Footnote 4 of the majority opinion, in refutation of facts disclosed by this dissent, I find, with all respect, equally as unsupported by the record as is the body of the opinion.
 
 
 193
 There follows an analysis of the footnote, albeit somewhat out of the same order in which the footnote is written:
 
 A.
 
 194
 The footnote ends with the conclusion that, "within contemplation of § 703(h), the job lines of progression policy here in question only came into existence in 1968," and, as a part of its authority for that conclusion, states that "a panel of this court has long since assumed" that fact. A principal problem with this case for some time has been the assumption of facts rather than their finding from the record. See, for example, my previous dissent at 586 F.2d 305, 306 concerning the promotion of supervisory employees, which required a similar factual analysis. The majority here, I suggest, assumes the same fact it says the panel assumed. Assumption of facts, especially critical contentious facts, is not an acceptable way to reach a decision, I think. Rather, resort to the record is required.
 
 
 195
 While I acknowledge an "exhaustive search of the evidentiary record," I must confess to disappointment because there was no "exhaustive counter-analysis of the factual record." I suggest that a counter-analysis would not have supported the critical fact on which the majority bases its opinion.
 
 B.
 
 196
 The position the majority takes in its footnote 4 is in reality twofold.
 
 
 197
 First, to support its conclusion that the lines of progression were only adopted in January 1968, it concedes that there were "informal rudiments" of such before 1965. Such informal rudiments, however, according to the majority, were replaced in 1968 by "stated procedures adopted by American in 1968 to control entry into and promotions within specifically identified job 'lines' ".
 
 
 198
 This conclusion of the majority, I think, is not only unsupported by the record, it is entirely refuted by the record.
 
 
 199
 Both the January 1965 and the 1968 collective bargaining agreements in their only references to lines of progression state in haec verba :
 
 
 200
 "All promotions and demotions shall be made in accordance with seniority except as otherwise agreed to by the Company and the appropriate Union local or locals, provided these promotions and demotions shall be made without regard to race, color, creed, sex, or national origin, and provided that, in the opinion of Management, there is no question as to the qualifications and efficiency of the employee concerned."
 
 
 201
 We must remember that "lines of progression" was not a part of the parlance of the employee, the employer, or the union until this claim became contentious. The parties all referred to job qualifications, as does the collective bargaining agreement. So, the "stated procedures" relied upon by the majority as coming into existence in 1968 in fact were in existence at least as early as January 1965. And not only were they in existence, they were letter for letter the same.
 
 
 202
 The above quotation from footnote 4 next provides that the job lines involved were "specifically identified." The use of "specifically identified" as used by the majority may easily have two meanings. One of the meanings is that the job lines were "specifically identified" in 1968 but had not been before. The other is that while the job lines had been "specifically identified" before, they were governed only by "stated procedures" beginning in 1968. Neither meaning is supported by the record. Neither the collective bargaining agreement of 1965 nor the collective bargaining agreement of 1968 has any job line which is "specifically identified." As I have heretofore pointed out, the number of job lines of progression was reduced in 1968. But, other than a reduction in numbers, the job lines of progression remained the same. The identity of the job lines of progression involved was known to everyone both before and after the 1968 agreement, as were the qualifications to benefit by one of those lines.
 
 
 203
 Footnote 4 goes on to say that within the specifically identified job lines of progression, "enough of change and formalization" took place in 1968 "to constitute a new policy, or at least one so radically altered from prior unstructured procedures" that it could not be considered a routine continuation of the old policy. I take issue with this fact finding also, and note it was not made by the district court but by this court.
 
 
 204
 That there was no "change" in the lines of progression policy by the collective bargaining agreements is clearly shown by the language of those agreements I have quoted above. The majority opinion then suggests that there was not only "change" but also "formalization" which had not existed before. By "formalization" the majority opinion may only suggest that that which theretofore had been informal was made formal in 1968. The short answer is that the policy was formal both in 1965 and in 1968, as is again shown by the collective bargaining agreements. What could be more formal than a written contract between the company and the union? I suggest that nothing could. And I note that the majority does not demonstrate by jot or tittle how anything became formal in 1968 which theretofore had been informal. While it finds that there was a "new policy" commencing in 1968, it fails to tell us what the old policy was. Indeed, this would also seem to be impossible in view of the letter for letter repetition of the 1965 provision in the 1968 contract. The remarks just above also apply to the majority's finding that if the policy was not new, it was "at least one so radically altered" that it could not be considered simply a routine continuation of old policy. What the policy was before alteration is also not explained in the majority opinion, and, for the same reasons I have outlined above, I suggest it is impossible to explain because there was no difference.
 
 
 205
 The majority relies on Teamsters, 431 U.S. at 352, 97 S.Ct. at 1863, for its legal conclusion that the policy it finds as either "new " or "so radically altered" is not "simply a 'routine application' " of "those pre-1965 procedures." It emphasizes that it construes § 703(h) as a "quite narrow exception" to Title VII's general coverage of conditions of employment, and again emphasizes that it considers the "routine application" of pre-1965 policies should be "given a stringent reading against any employer seeking the special insulation provided by § 703(h) for any seniority 'system' alleged to have been in place when Title VII was enacted." "On that basis," in the majority's words, it carries its "stringent reading against any employer seeking special insulation provided by § 703(h)" into fact finding, for the concluding sentence of the fact finding, "on that basis," is that the lines of progression only came into existence in 1968. I do not think that Teamsters, or any construction of it, authorizes a "stringent reading" against anyone, employer, employee, or union, with respect to fact finding. I had thought courts must be neutral fact finders.
 
 
 206
 If it be said that the "stringent reading against any employer" is meant only to refer to whether or not § 703(h) should apply, the majority has carried that "stringent reading" into full force and effect by the result it obtains on account of changes in the lines of progression. The only way the majority can find liability on this record without further fact finding by the district court is by giving such a "stringent reading" against the employer and the union that it actually finds liability when all the employer and the union tried to do was to improve the existing conditions for the plaintiff class, as I will set out below, for it must be remembered that each relevant change in the collective bargaining agreements disclosed in this record, whether pre- or post-act, has benefited the plaintiff class. None have been to its detriment.
 
 C.
 
 207
 While the above comments go largely to the majority's lack of factual support by analysis or by supporting testimony or exhibits to support its conclusion, and incidentally to its construction of Teamsters, perhaps the most serious error it makes in its efforts to support the key conclusion as to the 1968 establishment of lines of progression is this: It holds that if there is enough change and formalization of the lines of progression policy, whether in favor of or against employee interest," to constitute a new or radically altered policy, then the new policy is not entitled to a § 703(h) exemption. (Italics added.) " Employee interest" may only be considered the interest of the plaintiffs since that is what this case is all about, and there is no litigation at hand concerning the interest of other employees. Thus, the majority boldly holds that a change in a previously existing seniority system, although the change may be in favor of a class of black employees, will deprive the company and the union making the change from the benefit of a § 703(h) exemption.
 
 
 208
 Nothing I can think of could be less founded either in law or logic.
 
 
 209
 In the 1968 contract, for example, there is a provision for posting job openings either superimposed upon the system of lines of progression, or from which nine lines of progression were excepted. (1968 contract p. 4; stipulation 38.) Of course this action, especially when coupled with the elimination of certain lines of progression as took place, would only have had a favorable effect on the black employees as a class, for the cases are too numerous to bear citation, which, in their remedies, for racially discriminatory employment practices, provide for posting and bidding. Thus, logic rejects this aspect of the conclusion of the majority.
 
 
 210
 The law likewise rejects this conclusion in United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), in which the holding of the court was that it was not a violation of the 1964 Civil Rights Act for an employer and a union to agree to a preference for minority employees. The court said that the act is "intended as a spur or catalyst to cause employers and unions to self-examine and self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." 443 U.S. at 204, 99 S.Ct. at 2728. Thus, Weber approved actions by employers and unions designed to alleviate previously existing discriminatory conditions of employment. That part of the majority opinion providing that a company and a union cannot alter a seniority system so as to make more favorable the conditions of employment of minority employees is directly contrary to Weber, I think. It requires a too strained construction of the statute to hold that a seniority system admittedly discriminatory in effect, as in Teamsters, is protected by § 703(h) so long as it remains unchanged, but if it is changed in favor of the minority employees, then the employer and the union lose their § 703(h) exemption.
 
 
 211
 Not only is this conclusion contrary to logic and law, it is a blow against minority employees and contrary to the purpose of the statute. Hereafter, in this circuit at least, neither an employer nor a union may safely agree to any change in a seniority system existing before July 1, 1965 for fear that its § 703(h) exemption will be lost. Thus, a seniority system as rigid as the one approved in Teamsters, which protects a group of white employees, under the provisions of § 703(h), will receive the sanction of the statute and the blessings of this court, while a seniority system equally as rigid but which by the action of the employer and the union has, since July 1, 1965, ameliorated a part of the previously existing discriminatory conditions, will not. Such a conclusion, I suggest may sound astonishing, yet that is precisely what the majority holds.
 
 
 212
 I am authorized to state that Judge Russell concurs in this opinion.
 
 
 
 [1]
 Defendants first moved for relief in this court, seeking a recall of mandate and an order directing the district court to vacate its modified judgment. The recall of mandate was denied on the authority of Standard Oil Co. v. United States, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976), as not requisite to district court consideration of the motions for relief. Jt.Supp. App. 2, 3. Defendants then moved in the district court that the modified judgment be vacated and the complaints dismissed on the basis of the intervening decisions. While the motions did not identify the rule under which they were made, they are most appropriately treated as motions under Fed.R.Civ.P. 60(b)(5) for relief from a judgment certified as final for purposes of appeal under Fed.R.Civ.P. 54(b). Jt.App. 183-84
 
 
 [2]
 Frequently alluded to by the litigants as the "plantwide seniority system," essentially to distinguish it from the earlier departmental system that it supplanted in 1963
 
 
 [3]
 Plaintiffs have contended that 703(h) has no application to the job lines of progression policy because, as administered, the policy was not a seniority system within contemplation of § 703(h). Without challenging the proposition that the job lines of progression may constitute a 703(h) seniority system, see Teamsters, 431 U.S. at 355 & n.41, 97 S.Ct. at 1863 & n.41, the contention is that the only seniority system in effect at American was the plantwide (branch seniority) system; that it alone determined progression even within the job lines of progression adopted in 1968, there being no superimposed seniority system integral to this separate policy. Plaintiffs seek and find considerable support for this position in various formal representations made by American in this litigation that the job lines of progression policy was operated entirely on a plantwide seniority basis. This was not, however, a factual issue directly litigated in the case and the record as presently composed is ambiguous on it. In view of our stated basis for deciding that 703(h) has no application to seniority systems instituted after the effective date of Title VII, we need not address this as a possible alternative basis for decision
 
 
 [4]
 Judge Widener's dissenting opinion challenges this factual assertion, contending that this policy was demonstrably in effect prior to the effective date of Title VII in 1965. With all respect for his exhaustive search of the evidentiary record and for the fruits of that search in which he finds support for his challenge, we simply disagree with the inferences he draws and perhaps with the legal implication he derives from those inferences
 Without attempting here an exhaustive counteranalysis of the factual record, our perception is that while the informal rudiments of what is now described as a "job lines of progression policy" certainly existed before 1965, the stated procedures adopted by American in 1968 to control entry into and promotions within specifically identified job "lines" involved enough of change and formalization (whether in favor of or against employee interests) to constitute a new policy, or at least one so radically altered from prior unstructured procedures that it could not be considered simply a "routine application," see Teamsters, 431 U.S. at 352, 97 S.Ct. at 1863, of those pre-1965 procedures. As indicated in text of this opinion, we construe § 703(h) as a quite narrow exception to Title VII's general coverage of all "conditions of employment," including of course promotional policies, the prime subject of all types of seniority systems. In line with that narrow interpretation, we consider that "routine application" should be given a stringent reading against any employer seeking the special insulation provided by § 703(h) for any seniority "system" alleged to have been in place when Title VII was enacted. On that basis, we conclude, as a panel of this court has long since assumed-without intervening challenge of fact or law-that within contemplation of § 703(h), the job lines of progression policy here in question only came into existence in 1968.
 
 
 [5]
 The applicability of § 703(h) to seniority systems initiated after the effective date of Title VII was not decided by Teamsters. See Note, 52 Tul.L.Rev. 397, 405 (1978). The EEOC position is that § 703(h) has no applicability to seniority systems not in operation at the effective date of Title VII. EEOC Notice N-915 (July 14, 1977), reprinted in EEOC Compliance Manual P 6500. We need not here embrace in its entirely this EEOC interpretation of Teamsters to agree that the legislative history suggests that post-Act seniority systems were not intended to be included in the protection of § 703(h). A memorandum prepared by Senators Clark and Case stated in explanation of the intended effect of this section that "Title VII has no effect on established seniority rights." 110 Cong.Rec. 7213 (1964). The Justice Department noted that "Title VII would have no effect on seniority rights existing at the time it takes effect." Id. at 7207. In discussing this legislative history, the Supreme Court noted in Teamsters that Title VII would allow "full exercise of seniority accumulated before the effective date of the Act," 431 U.S. at 352, 97 S.Ct. at 1863, and that Congress did not intend to punish employees by destroying their "vested seniority rights ... simply because their employer had engaged in discrimination prior to the passage of the Act," id. at 353, 97 S.Ct. at 1863. The question of the application of § 703(h) to seniority systems initiated after 1965 was not present in Teamsters and apparently has not been authoritatively addressed subsequently. Considering that Title VII is a broad remedial statute, we believe the legislative history supports the view that only those bona fide seniority systems in operation when Title VII took effect are entitled to the protection of § 703(h). Systems initiated in the post-Act period must of course pass muster under the Griggs analysis in the same manner as other facially neutral policies or practices challenged as discriminatory in their consequences. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [6]
 For guidance in addressing the issue the district court may find helpful the Fifth Circuit's decision in James v. Stockham Valves & Fittings Co., 559 F.2d 310, 350-53 (5th Cir. 1977)
 
 
 [7]
 See note 1 supra
 
 
 [8]
 There is no dispute that the appropriate geographical area from which to draw base statistical data is that defined by the Richmond SMSA
 
 
 [9]
 This excludes any consideration of the special case of the Richmond office which, with only four or five post-Act vacancies involved, is not in issue on this appeal
 
 
 [10]
 Under Evans, of course, the beginning of the relevant time period may be at later times set by limitation periods for charging violations
 
 
 [11]
 Except for the limited purpose of proving inferentially the continuation of pre-Act discrimination into the post-Act time period. See Hazelwood, 433 U.S. at 309 n.15, 97 S.Ct. at 2742 n.15
 
 
 [12]
 The possibly decisive force of defendants' proof of post-Act appointments if properly considered under Hazelwood's teaching is exhaustively explored in Judge Widener's opinion dissenting from the withdrawn panel opinion in this appeal. 586 F.2d at 306-10. Without attempting prejudgment of the matter, we draw attention here to that analysis merely to emphasize our conviction that Hazelwood's impact may not have been fully appreciated by the district court in ruling on the Rule 60(b) motion
 
 
 [13]
 This will require a rough break-out of appointments by hiring from those by promotions (or transfers) from within American's work force. The relevant labor pool for assessing discrimination in promotion practices consists of qualified lower level employees. E. g., Hill v. Western Electric Co., 596 F.2d 99 (4th Cir. 1979)
 
 
 [14]
 While we have earlier noted the possibly decisive force of SMSA statistics as the appropriate qualified market data, see note 12 supra, the question of their actual appropriateness will itself require analysis by the district court. Defendants contend that we have already decided their appropriateness by stating in our original panel decision that they provided a "more realistic measure of the company's conduct than the gross percentage of blacks and women in the whole work force." 535 F.2d at 275. This was said, however, in the context of an evaluation of the propriety of the district court's remedial order. The question of their appropriateness for determining liability in the first instance is an open one on the present record. The SMSA statistics give the percentages of blacks and women in the Richmond area who are employed in jobs denominated as "supervisory" in the total labor pool there analyzed. Whether these percentages substantially reflect the percentages of persons in that pool "specially qualified" for American's particular supervisory positions is not manifest on the present record
 Until the actual nature of any special qualifications required for American's positions is determined in some factual detail, the probative force of the SMSA data will not be apparent. In any event, plaintiff is not absolutely required to produce evidence of the actual percentages of specially qualified blacks and women in the relevant labor pool in order to make out a prima facie case. Other data, e. g., applicant-flow statistics, may be "very relevant," Hazelwood, 433 U.S. at 308 n.13, 97 S.Ct. at 2742 n.13, though this has to be carefully assessed in light of the particular situation in issue. See Dothard v. Rawlinson, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977).
 
 
 [15]
 Hazelwood did not entirely rule out the use of general population and general work force statistics in "special qualification" cases, simply pointing out that "(w)hen special qualifications are required to fill particular jobs, comparisons to the general population ... may have little probative value." 433 U.S. at 308 n.13, 97 S.Ct. at 2742 n.13 (emphasis supplied). The question remains whether under the circumstances of a particular case the statistical proof offered justifies the inference on which the prima facie case rests. Our own post-Hazelwood cases have made it plain, however, that where special qualifications are found to exist, general population and work force statistics will not normally suffice as the base data for establishing a prima facie case. See EEOC v. Radiator Specialty Co., 610 F.2d 178 (4th Cir. 1979); Hill v. Western Electric Co., 596 F.2d 99 (4th Cir. 1979); EEOC v. Chesapeake & Ohio Railway, 577 F.2d 229 (4th Cir. 1978)
 
 
 [1]
 The actual sequence of what transpired was that after we decided Patterson II defendants moved us to recall the mandate and to reconsider our decision in the light of, inter alia, Hazelwood. In denying the motion, we stated in our order that "(t)he parties may present to the district court all questions of law arising out of recent Supreme Court cases ... and they may offer such supplementary evidence as may be pertinent ..."
 
 
 [2]
 The majority in banc opinion refers to the number as being approximately 30 in number. Presumably this statement is based upon the district court's finding that "at least" 18 and 9 persons were hired or promoted to supervisory positions at the Virginia and Richmond branches, respectively. But the district court in later findings found that from January 1, 1963 to June 1, 1973 there have been over 55 and 30 vacancies in the assistant foreman position at the Virginia and Richmond branches, respectively, and since 1966, 4 vacancies in the position of supervisor in the Richmond office
 
 
 [3]
 For the reasons set forth in Part I of this opinion, I would deem as the appropriate measure the proportion of blacks in the overall workforce (23.6%)
 
 
 [1]
 I would not find it either necessary or appropriate to make the majority's holding that § 703(h) only applies to seniority systems in existence on the effective date of the Act, although I note that the statutory language and legislative history do not require this holding. The Supreme Court has specifically noted in Teamsters that § 703(h) on its face immunizes all bona fide seniority systems. 431 U.S. 348, n. 30, 97 S.Ct. at 1861 n. 30. Although § 703(h) is written as an exception and not as a grandfather clause, the majority simply transforms an ordinary exception into just that. Congress undoubtedly knows how to write a grandfather clause if it wishes, but in this case wrote an exception instead. New plants, for instance, are summarily excluded from § 703(h) in the majority view, without stated justification
 
 
 [2]
 The district court's stipulation 38 states that a posting and bidding system was instituted in 1968, and that there were exceptions for nine named lines of progression. It does not state whether the lines already existed in 1968 or whether the lines were created in 1968. In light of the full record, the former interpretation is clearly correct. The stipulation reads in full:
 
 
 [38]
 On January 15, 1968, the defendant Company instituted a system (which is still in effect) whereby permanent vacancies in classifications under the jurisdiction of Local 182 of the T.W.I.U. at both the Richmond and Virginia Branches were filled through job posting and employee bidding. Under this system, all such vacancies are posted on plant bulletin boards for seven working days. Anyone in the bargaining unit may sign any posting (bid on any job) with the exception of postings for vacancies in the adjuster, learner adjuster, examiner-making, examiner-packing, and dryer operator, textile dryer operator, overhaul adjuster-making or packing, and turbine operators classifications at the Virginia Branch and adjuster and learner adjuster at the Richmond Branch
 What this opinion refers to as stipulation 38 is actually paragraph 38 of stipulation 1. Other numbered stipulations referred to are the numbered paragraphs of stipulation 1.
 
 
 [3]
 A search of the 52 volume record reveals no evidence to the contrary
 
 
 [4]
 Similar interrogatories were put to the defendant unions. The local and the international provided separate answers, all of which are not illuminating. Plaintiffs' First Interrogatories to Defendant Unions, (Record, v. I, p. 30), includes interrogatory 23 (Id. p. 37):
 
 
 [23]
 State whether American Tobacco and defendant have entered into any agreements which in any way altered, restructured, rearranged or merged the lines of progression in any of the departments or units utilized by the Company for organizing its employees by jobs performed. If so, ... (state) the dates of the agreements
 Defendant Local No. 182's Answers to Plaintiffs' First Interrogatories (Record, v. I, pp. 95, 98) states:
 
 
 [23]
 See attached copies of contracts. Chief negotiators for both sides shown in back of attached contracts. Dates of agreements also shown. Dates of negotiations not known
 The Defendant Tobacco Workers International Union's answer simply states that "International has not entered into any agreement with The American Tobacco Company." (Record, v. I, pp. 100, 107). Every union contract in the record, covering the period from 1960 through 1974, states that promotions are based on seniority and qualifications. None of the contracts mention "lines of progression." See Plaintiffs Exhibit 35FF and page 9 infra.
 Plaintiffs' First Interrogatories to Defendant American Tobacco Company, interrogatory 5 (Record v. I, pp. 47, 49), is: "State whether jobs in the plant are organized or grouped in any way into departments and/or lines of progression." The Company's answer, in relevant part, is: "There are a few jobs with qualifications other than seniority under the 'posting and bidding' system and these are listed in the attached 1968 agreement between Management and the three Eastern Locals (182, 183, and 192 of the TWIU)." (Record v. I, p. 285). Notwithstanding what the answer claims, the 1968 agreement does not mention liens of progression or the particular jobs involved, and neither does any of the other union contracts.
 
 
 [5]
 The EEOC put similar interrogatories to the Company, and received similar answers. See EEOC Interrogatories 1-20 to Defendant American Brands, Inc., d/b/a The American Tobacco Company, interrogatories 8 and 16 (Record, v. I, pp. 195, 201, 203-204) and the Company's answers (Record, v. I, pp. 315, 318, 321-324 (Richmond Branch), and pp. 327, 332, 336-338 (Virginia Branch))
 
 
 [6]
 Since the district court found that three of the lines were justified by business necessity (see Finding # 31, EPD p. 6013), only six lines are actually at issue. However, because all nine lines pre-date the Act, they are all, if bona fide, protected by § 703(h), whether or not they are justified by business necessity
 
 
 [7]
 American's answers to plaintiffs' first set of interrogatories contain numerous other references to the existence of "qualifications" prior to 1968 and to the elimination or reduction in the number of lines of progression in 1968. See, e. g., answers to interrogatories 20, 25, 26, 28, 29 (Record, v. I, pp. 294, 296, 298, 299, 300)
 
 
 [8]
 American Tobacco's Motion to Amend and Supplemental Findings of Fact and Conclusions of Law and to Proffer Additional Evidence (Record, v. IV, p. 130) includes Proposed Supplemental Finding of Fact # 5;
 
 
 [5]
 Both the Richmond and Virginia Branches established plant-wide seniority in 1963. The Richmond Branch has never used prior experience on a job as a prerequisite to a promotion to any job under the jurisdiction of TWIU Local 182. The Virginia Branch used "qualifications" (prior experience) in certain classifications until January 15, 1968
 (Stipulation # 38 directly contradicts the second sentence of the proposed finding.)
 
 
 [9]
 The Court denied defendants' motion to amend and supplement. Record, v. IV, p. 267